[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15882

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 2, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-00196-CR-1-BBM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellant-
Cross-Appellee,

versus

KELLY BRENTON FARLEY,

Defendant-Appellee-
Cross-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(June 2, 2010)

Before CARNES, HULL and ANDERSON, Circuit Judges.

CARNES, Circuit Judge:

In the Fall of 2006, Kelly Farley was a thirty-seven-year-old businessman living in Texas with a pregnant wife and five children, ranging in age from one to fourteen. His interest in families was not limited to his own, and his sexual interests extended beyond what our society and its laws will tolerate. Farley is sexually attracted to girls he described as "still innocent, but starting to bud a little," and he wanted to have sex with a girl who was around nine to eleven years old. Using the internet, he made contact with the mother of a child of that age and set out to persuade her not only to let him have sex with her daughter but also to join him in sexually violating the child.

To reach that goal Farley engaged in a steady stream of chat room conversations, emails, and phone calls over a period of seven months with the mother, leading up to his arrival in Atlanta carrying directions to the place where he planned to rendezvous with her and her eleven-year-old daughter. Farley's actions led to his arrest, which led to his trial, which led to his conviction and sentence, which led to the government's appeal of that sentence, which led to Farley's cross-appeal of both his conviction and sentence, all of which led to this opinion.

## I.

On October 3, 2006, Kelly Farley entered a Yahoo! online chat room called "Fetish 14," which was devoted to the topics of incest and sexual molestation of children. Through the chat room Farley, who lived in the Dallas area, initiated contact with "Stephanie," whose online profile identified her as a forty-one-year-old Atlanta single mother of a ten-year-old girl. Once Stephanie accepted Farley's invitation to chat privately, he wasted no time getting down to business. Within the first three minutes, he asked her how long she had been interested in the "room topic" and whether her involvement was "active" or merely fantasy. He told her that "my wife would flip if she knew I was into it." Noting that Stephanie's profile mentioned a daughter, Farley asked if the mother ever got to "see anything." He also asked Stephanie what her "favorite age" was, and she answered that it was her daughter's age, ten years old. After questioning Stephanie about how long she had been attracted to her daughter and what she did to "get looks and appease [her]self of the urge," Farley suggested that she should arrange for her daughter to walk in on her while she was masturbating. When she said that had happened once, Farley replied that Stephanie should have "offer[ed] to show her how."

Farley confided to Stephanie that he had been "attracted to younger girls for a while." He told her that he had twelve-year-old and ten-year-old daughters, and a

3

fourteen-year-old son, but that he had not been "active" with them because he was afraid that his wife might find out.[1] He claimed, however, that there was a fourteen-year-old girl he had met online and had "[met] up with for sex." Stephanie asked if ten was too young for him, and Farley answered "no not too young." He then asked if the daughter "ha[s] any hair yet." Stephanie told Farley that she wanted to find a man who could introduce her daughter to sex. He suggested that she "set it up so that you and [me] are having sex or oral or something and [the daughter] walks in on it." He thought that would be the easiest way to "invite her into it."

When Stephanie complained about the difficulty in finding a partner for this project, that it's "hard to find someone 4real" because most men were "full of BS," Farley assured her that he was "looking for real," and that he would take the real experience "as far as you are comfortable going." Farley said that while he had never been with a ten-year-old girl, he had been sexually active for nearly a year with the fourteen-year-old he had met; he expressed the opinion that there was no difference between the ages from a "making it happen point of view" as long as the girl felt "comfortable and safe."

---

[1] In fact, Farley had five children: two boys then aged fourteen and ten, and three girls aged twelve, eight, and one. During the months Farley was chatting with Stephanie, his wife was pregnant with their sixth child, a boy born only weeks after Farley was arrested.

Farley told Stephanie that his name was "Kelly" and he shared details about his real job as regional vice president for a Dallas staffing company. Stephanie told him she was "Stephanie Miller" and said that her daughter was named "Sydney." Farley suggested he might soon visit their hometown of Atlanta on business, but expressed some concern that Stephanie might be "a cop trying to entrap me."

On October 9, 2006, Farley initiated another chat with Stephanie. After once again assuring her that he was "for real," Farley pressed her for details about the time her daughter had walked in and seen her masturbating—the "teaching part," as he put it. "It will help with the environment to move to the next step," he explained, "something that she feels is natural and fun, not like she is doing something wrong or to be embarrassed about." Farley suggested that the girl would be more comfortable having sex with a man if her mother were also present and participating. He assured Stephanie that he wanted to be "a part of [her] plans," a "long term thing" and that he "would teach and watch [the child] blossom over the years."

When Stephanie asked how he envisioned it happening, Farley said that they would meet, have dinner, go back to her place, drink some wine, and give the child a few sips. Then he and Stephanie would start "messing around," letting the

5

daughter watch to "make it natural," perhaps with a pornographic movie playing in the background. To prepare Sydney for the experience, Farley suggested that Stephanie watch pornographic movies and let her daughter see her masturbating to them. "You have to be a sexual part of this," he insisted. When Stephanie told him that Sydney was standing next to her as she typed, Farley told Sydney to "come real close" to the screen and asked her how she was enjoying her day off from school. Told that the girl had run off giggling, Farley resumed his conversation with Stephanie and boasted, "I still have it after all these years, even with 10 year olds."

Farley then questioned Stephanie about her own childhood sexual experiences. In response to Stephanie's story that she had sex with her stepfather at age twelve, Farley said, "I would imagine if it is done gently, lovingly and consistently it is not looked at as anything strange." Stephanie then asked Farley what made him want a "real" experience. Farley answered that he had been "interested in younger" for a while, "never my own, but those ages." He said that he would like to have an ongoing relationship "with the mom's involvement to teach, and guide . . . jointly teaching her, so no secrets for her to hide or feel guilty about those kinds of things, totally open, and with no dad to worry about makes it better."

6

Noting that he had "a lot to lose," Farley asked Stephanie to get a webcam so he could see her on live video during their chats and make sure that she was "real and not some cop or something." Stephanie never hooked up a webcam, although she did send Farley a real photo of herself standing next to a nine-year-old girl.

On October 13, 2006, during another chat session, Stephanie once again asked Farley what made him want a real experience. In response, Farley described the downward arc of deviance his sexual interests had taken:

> It is kind of the progression of porn actually . . . as a teen started looking at porn; as you look at more and more, you need harder and harder stuff to really get[] you going, so you go from like playboy, to penthouse, to hustler, etc., then from adult, to teen, to curious about younger. Then I discovered chat rooms . . . that is where pics and links were posted and I started seeing younger pics, then pics of younger in action, and it just got hotter and hotter . . . so the natural progression is then not just wanting pics [and] vids but wanting the real thing, which le[]d me to teen chat rooms, then meeting a teen in person, now to this point.

Farley said that he had seen "pics and vids as young as they come," and Stephanie responded that she had seen some similar pictures online. Farley suggested that Stephanie trade child pornography pictures with him, but he backed off when neither of them volunteered to be first to send an image. He asked Stephanie what age excited her most; she answered "9–10." Farley said, "Yeah me too . . . something about that age, still innocent, but starting to bud a little." Farley asked Stephanie how she thought it would happen. Stephanie said that she

7

wanted it to be "very special," that her daughter would be "a princess for the day," and that if the right person "shows her everythi[ng] and it is done right things will be perfect."

Farley asked if they could talk on the phone, but Stephanie was reluctant to give him her number. Farley noted "we are both very nervous here" and suggested Stephanie was afraid he might be a "cop" who would trace her call and show up to take her away in handcuffs. He promised her he was not, and she assured him likewise.

Over the next four months, Farley and Stephanie had only occasional, brief chats. Farley worried that Stephanie had "decided [he] was a fraud" and had given up on him. He told her his real last name, and said that he hoped to visit Atlanta sometime soon and wanted to have dinner with her.

When Farley and Stephanie chatted again on March 8, 2007, he told her that he had met a woman from Toronto online who was "active" with her ten-year-old daughter. He said that the woman lets her daughter see her masturbating, "lets her touch and has taught her how to rub . . . herself," and had even allowed Farley to watch the process by using a webcam. Farley asked Stephanie if she had done anything similar with her own daughter, and suggested once again that she rent a pornographic movie and arrange for Sydney to catch her masturbating while

8

watching it. He advised that Stephanie should not act shocked or surprised when her daughter walked in, because "she needs to see you doing things . . . before I show up and get involved." He told Stephanie that night was the night to start: "Have her and you get in just t-shirt and panties, and when you start playing . . . tell her it feels good and is natural, walk her through it by talking to her, tell her what to do, then ask her if she wants you to help her, touch her and get her to touch you." He also suggested she get a webcam so that she and Sydney could chat with the Toronto woman and her daughter, "letting Sydney see it's ok and teaching her together."

On March 23, 2007, Farley was laid off from his job as Regional Vice President for the Dallas branch of Dalrada Financial Corporation.[2] That same day several images of child pornography were downloaded onto Farley's laptop. Farley thereafter did part-time contract work for an affiliated company, Strategic Staffing Services, and continued to work from Dalrada's office.

During April 2007, Farley made several attempts to reach Stephanie through offline messaging. On April 25, Stephanie wrote back expressing impatience with him: "I thought you were for real. . . . I get the feeling you are all talk . . . if [you are] not full of BS let me know." Farley told her he had lost his job but he still

_____

[2] Farley lost his job after he had gotten in trouble for using a company-issued debit card to pay for access to an online porn site, but according to his former supervisor, Farley was not fired but was laid off because of corporate downsizing.

hoped to make a trip to Atlanta.  On April 30, they chatted again.  Farley assured

her that he was not "full of crap" and would not have left so many messages for her

if he was.  Stephanie wanted to make sure "you and I are on the same sheet."

Farley responded, "As long as you are not a cop we are."

Farley then asked her if she had tried "the movie thing."  She said that she

had watched one, and that Sydney had peeked in and asked some questions.  When

he asked if Sydney had seen her masturbating yet, Stephanie told him that she had

to be careful because she did not want to "freak her out."  Farley said he totally

understood, "but to be natural for her she needs to see it being [done] naturally

without feeling like it is something to hide or be ashamed of.  If she walked in and

you were playing with yourself, you could explain that the movie and doing that

makes you feel good."  Stephanie told him that Sydney had heard about

masturbation from some of her friends, and Farley questioned her in detail about

that, calling it "too cute."  Stephanie complained that Farley was expecting her to

do all the talking.  Farley answered, "We have talked in detail in the past about

how you want things to happen; we both know that we want the same thing."

Asked why he wanted to be involved in it, Farley answered, "because I want to be

part of a mutual, sensual, family experience where it is open, supported, gentle,

wanted."  They then exchanged telephone numbers and had a brief phone

conversation in which they discussed the possibility of him visiting Atlanta. On the same day, Farley emailed Chris Polk, owner of Strategic Staffing Services, and suggested that they arrange a business meeting with a prospective client in Atlanta sometime in the next few weeks. The Atlanta meeting was not Polk's idea but Farley's.

On May 2, 2007, Farley initiated another chat and told Stephanie he planned to visit Atlanta in two weeks. In the meantime, Farley gave Stephanie a "homework assignment" to watch a few more adult movies with Sydney before he arrived. He instructed her to put on a video and call Sydney in to join her; then Farley would call and talk to Sydney while she watched the pornography. Stephanie was to introduce Farley to Sydney as an "old friend" with whom she liked to do things "like she sees in the videos." Farley suggested that they bring a camera to take pictures and "have our own home movies." Once again, Farley expressed concern that he might be walking into a "Dateline NBC"-style sting operation. Noting that he had been unable to find any phone listing for a "Stephanie Miller" in Riverdale, the Atlanta suburb where she had told him she lived, Farley worried about "showing up for dinner with you and having Dateline there waiting for me because [of] what we have talked about." "Let's make a

11

pact," he proposed: "I promise that I am not a cop and will not bring Dateline if you do too."

On May 3, 2007, Farley called to ask Stephanie what she had told Sydney about him and inquired if Sydney was there. Sydney then got on the phone. Farley asked her how school was going. When Stephanie came back on, Farley asked if she and Sydney would be watching a movie that evening.

On May 4, 2007, Farley took the conversation to a new low, describing to Stephanie in graphic detail what he intended to do to Sydney, who had recently had a birthday and was now eleven years old. He began their chat session on that date by asking Stephanie what had happened during the movie the previous evening. She told him that while they watched the pornographic video she "began touching . . . and rubbing her [daughter]" and that she told Sydney they were watching the video "so that she would know what was going to happen." Farley then narrated a "dream" he had about the mother and daughter, which amounted to his step-by-step plan for how he and Stephanie would sexually molest Sydney.[3] First, they would all three sit on the couch and watch a pornographic movie together. As they were watching it, Stephanie would remove Farley's clothes and while they were

_____

[3] In his May 4, 2007 chat session and email to Stephanie, Farley went into a great deal of detail, graphically describing every aspect of the sexual violation of Sydney that he planned. Quoting all that he said would be tantamount to publishing obscenity, so we will instead summarize his statements and include only enough description to leave no doubt about the nature and extent of the acts that Farley intended.

kissing he would rub her breasts, she would rub his penis, and then she would take the child's hand and put it on his penis and help her "feel the real thing" while they watched the movie. When Stephanie remarked that Farley's dream "sounds so real," he responded "Yes, that is how I see it happening." Farley then described how they would have the child masturbate him while he masturbated Stephanie, and then have her masturbate her mother. After that, Farley would have the child perform oral sex on her mother after he showed her how to do it. They would, he said, "go back and forth taking turns."

Later that same day, Farley emailed Stephanie to finish his description of his "dream," picking up where their earlier chat session had left off. He described how, after he and Sydney had performed oral sex on Stephanie, they would then tell the child that it was her turn and how good it was going to feel. The mother and Farley would take turns performing oral sex on the little girl, masturbating her, and digitally penetrating her. Then they would have her watch closely as Farley had sexual intercourse with her mother, and after awhile the mother would place the child on Farley's lap and help him penetrate the child and have sexual intercourse with her. That part of their session would end with mother and daughter performing fellatio on Farley. Then, as Farley described it, "we move on to round two."

13

The next day, May 5, 2007, Farley called Stephanie and asked if she had read his email. Farley also talked about his children's soccer games and joked about wanting to coach eleven- and twelve-year-old girls. He told Stephanie he would be arriving in Atlanta on the evening of May 15th. He later left her two more voicemail messages asking if she had read the email yet. On May 7, Stephanie replied to Farley's email and asked him if the scenario it described was just a dream, or was his plan for what actually would happen when he visited. On May 9, Farley responded that he "can't wait to see the real thing." In a chat session, Farley told Stephanie that he had been "rock hard" while typing the email, and that she and Sydney could be his "second family." When Stephanie asked if he was nervous, Farley responded:

> Very!!! Actually scared that I am going to show up, get busted, and have to explain that to my wife and kids. . . . OK, since we are on the paranoid conversation . . . please assure me that I am not walking into some kind of Dateline type set up. Repeat after me: I am not a cop, I am not setting you up, I am not working under the authority of any police authority.

Farley then asked Stephanie to watch another pornographic movie with Sydney before he arrived and said that he would love for Sydney to "help" her mother masturbate one more time. Still seeking reassurance that Sydney was real, Farley asked Stephanie to send a picture of the two of them together holding a sign that said "Can't wait to see you Kelly." Stephanie emailed back to say that Sydney

14

"thinks [he is] so cute" and that she was excited to know they would share the experience together. She asked Farley what they should wear. Farley emailed back the next day, May 10, and repeated his request for a picture of Sydney. He suggested that the eleven-year-old come to their meeting wearing no panties.

On May 10, 2007, Farley booked a ticket on American Airlines to fly from Dallas to Atlanta on the afternoon of May 15 and return on the afternoon of May 16, and he made a reservation for the night at the Holiday Inn on Spring Hill Parkway in Smyrna, a suburb of Atlanta. Chris Polk's company arranged to pay for Farley's flight, hotel, and rental car. Farley was scheduled to meet on the morning of May 16 with a prospective client at an office on Roswell Road in Marietta, another suburb of Atlanta.

On May 11, 2007, Farley emailed Stephanie and again suggested that she watch a movie with Sydney and "get her help a little more" with masturbation. He asked for Stephanie's address so that he could go on Mapquest and plan his route from her house either to his hotel, or to his meeting the next morning, "depending on how the night goes." In a phone call later that day, Farley asked Stephanie how much Sydney knew about what was going to happen. Stephanie responded that she had told Sydney they would be doing "what we saw in the movies" and that the

15

eleven-year-old had asked if it would hurt. Farley told Stephanie that was a "good question."

Farley then inquired if Sydney knew "not to tell anybody." He asked where they should meet for dinner, and Stephanie suggested the IHOP restaurant in Riverdale. In a second phone call, Farley again expressed his fear that he would be walking into a sting operation with "TV cameras." However, that fear did not stop him from planning further details of his visit. Farley promised he would try to book an earlier flight so that the sexual molestation of the eleven-year-old would not keep her up past her bedtime. He also suggested that they serve her some wine coolers.

Two days later, on May 13, 2007, Stephanie told Farley in an email that she had taken her daughter to Six Flags amusement park where Sydney had gotten a bad sunburn. Stephanie said the child asked her if sex would "hurt really bad," because one of her friends had told her that it would. She asked Farley to send Sydney an email reassuring her. On May 14, the day before his planned trip, Farley initiated a chat with Stephanie and told her to assure her daughter that "it will all be fun for everyone, and no one will do anything they don't want." When Stephanie again mentioned Sydney's sunburn, Farley said they would "rub some lotion on her." He asked if the eleven-year-old had any hair growing "down there"

16

yet, and suggested that Stephanie shave off her own pubic hair so that she would "match" her daughter. He told Stephanie to have her camera ready. Farley then sent Stephanie an email addressed to "Syd." Writing directly to the eleven-year-old girl, Farley said the following:

> I hope your sunburn is feeling ok. I am sorry we didn't get to talk this weekend. I am looking forward to seeing you tomorrow. We will all have a great time hanging out. Please don't worry about anything, we will not [be] doing anything that will hurt you or that you don't feel comfortable with. The idea is for all of us to have a really good time together and that is fun!! I am sure that you have seen what a good time those folks have on the movies, that is how we will be. We will take pictures and laugh and share in some fun times. I hope that the sun burn is better, if it still hurts we can make sure to rub lots of lotion on it to help the pain. I understand you are not feeling well today, I hope you feel better. I am looking forward to dinner tomorrow night. If you are at home tomorrow I will try and call in the morning before I leave.

Farley then sent Stephanie two more emails. Attached to one was a photograph of his face; to the other, a photograph of his penis. In a phone conversation the following morning, Stephanie asked if "that" was "for me or for her." Farley answered: "Both." On the afternoon of May 15, 2007, Farley flew from Dallas to Atlanta on American Airlines flight 474 to conduct his business and to live out his dream of having sex with an eleven-year-old child and her mother.

## II.

Of course it was not to be. The woman Farley knew as "Stephanie" was actually Detective Joanne Southerland, a Clayton County Sheriff's Office

17

investigator and a member of the FBI's "Safe Child" task force, who was conducting an undercover investigation into child exploitation. She had been involved in over a hundred similar investigations, and Farley is not the first of her online correspondents to end up before this Court. See United States v. Mooney, 303 F. App'x 737, 739 (11th Cir. 2008) (per curiam). Law enforcement personnel recorded and preserved Farley's chats, emails, instant messages, voicemails, and phone conversations with Stephanie. There was no "Sydney." The voice Farley heard in what he thought was a phone conversation with the child belonged to an FBI employee speaking in a childlike voice. As Farley had suspected out loud to "Stephanie" on seven different occasions, it was a sting operation. Still, he had single-mindedly pursued his "dream."[4]

---

[4] Farley's damn-the-suspicions-and-full-speed-ahead recklessness is not unusual with sex predators who prey on children. In his book former FBI Director Louis Freeh tells about an early operation, called "Innocent Images," the Bureau set up to catch those who used chat rooms to search for victims:

> I'm not sure anymore what I expected Innocent Images to turn up by way of numbers, but whatever it was, it was insufficient to the reality. It was like happening upon some incredible trout stream never before visited. The fish just couldn't stop taking the bait. The more people we put on the program, the more cases we made. A little publicity followed. Surely, I figured, word would get around, and the bait taking would slow down. But no.
>
> I said as much one day to one of our young agents working the Internet for Innocent Images.
>
> "This can't last, can it?"
>
> "Watch this," she answered as she plunged into yet another chat room.

18

**A.**

When Farley's flight landed at the Atlanta airport, the passengers were instructed to remain seated.  Task force head Agent Stephen Paganucci and Agent John Robinson, along with a uniformed officer from the Atlanta Police Department, boarded the plane at 4:35 p.m. and went to Farley's seat.  They asked him for identification, told him to stand up, and handcuffed him.  Paganucci told Farley he was being detained for questioning but could not remember whether he specifically told him he was under arrest.  The agents retrieved Farley's suitcase and briefcase, led him out of the plane and into a nearby police car, and drove him to the Atlanta Police Department's airport substation.

Soon after they arrived at the substation, between 4:45 and 4:47 p.m., Agent Paganucci showed Farley an "Advice of Rights" form and read each warning out loud as Farley initialed it.  Farley acknowledged he understood that he had the

---

"Hi," she typed in, "I'm Amy, I'm thirteen, and I'm lonely.  Is anyone there?"

Within seconds, she had ten hits.  Then she changed course dramatically.

"I'm not Amy," she pecked in.  "I'm a twenty-eight-year-old FBI agent."

But that didn't stop things for a moment.

"Yeah, right," came the responses.  "Where can I meet you?"

We were laughing watching the screen, but it wasn't humorous in the least.

Louis J. Freeh, My FBI 197–98 (2005).

right to remain silent, that anything he said could be used against him in court, that he had the right to talk to a lawyer before questioning and during questioning, that a lawyer would be appointed for him if he could not afford one, and that if he decided to answer questions without a lawyer present, he had the right to stop answering them at any time. Farley then signed a "Waiver of Rights" on the same form, which stated that he had read the warnings and understood them, and that he was willing to answer questions without a lawyer present.

Agents Paganucci and Robinson spent about an hour and a half questioning Farley in the substation's conference room. Farley was cuffed to his chair by one hand, but he was allowed to go to the bathroom when he asked. Paganucci testified that the questioning was "cordial" at first and then gradually got more "accusatory," but the agents never yelled at Farley or drew their weapons.

Agent Paganucci initially attempted to disguise the purpose of the questioning by telling Farley it was a national security matter. He told Farley "there was some FBI program that picks up certain words online like terrorist, threats and things of that nature." Paganucci may also have told Farley that the interview would last about forty-five minutes. The record does not indicate whether he made these remarks before or after he advised Farley of his rights. At some point during the interview, Paganucci falsely told Farley they were waiting

on a fax from the FBI's Dallas office. Once the questioning got underway, however, it quickly became clear that the agents were asking whether Farley had come to Atlanta to have sex with a child. Paganucci testified that all of Farley's statements were made after he had been advised of his rights and had waived them.

According to Agent Paganucci,[5] Farley admitted that he was the exclusive user of the Yahoo! account from which all of the emails and chats with Stephanie had originated. He told the agents that he spent two or three hours a week in sexually oriented chat rooms and had met Stephanie in one of them. At this point, Farley did not know that "Stephanie" was really an undercover agent and apparently did not know that there was a verbatim record of all of his emails, chats, and phone conversations with her. He admitted to the agents that he had engaged in sexually oriented chats with Stephanie, but said that she had been the one pushing the idea of him having sex with her daughter. Farley claimed he had only played along with her "fantasy" because he wanted to have sex with Stephanie and insisted he had no interest in having sex with a child and did not find the idea arousing.

---

[5] Consistent with FBI policy, the interview was not recorded, and Farley did not write out a statement. Agent Paganucci took notes and later wrote up a four-page report, mostly paraphrasing Farley's oral statements but marking a few phrases as direct quotes. The facts in this part of our opinion are taken from Paganucci's testimony at trial.

When the agents accused Farley of working with Stephanie to "groom" the child for sex, Farley denied it, although he admitted that he knew Stephanie had shown her daughter a pornographic video. When the agents asked him about his purported sexual relationship with a fourteen-year-old girl he had met online, Farley said he had made that up to impress Stephanie.[6] When they asked him if they would find any child pornography on his computer, Farley admitted that he had viewed such images more than once while browsing the internet, but he insisted that he never searched for them and always deleted them after viewing. Farley admitted sending Stephanie a picture of his penis. He said that the main purpose of his Atlanta trip was to arrange a business deal for Strategic Staffing Services, but he admitted that he had planned to call Stephanie and then meet her and Sydney at the IHOP restaurant. He told the agents he thought Sydney was twelve years old.

While Agents Paganucci and Robinson were beginning their interview of Farley, other agents conducted a warrantless search of the suitcase and briefcase he had brought with him on the flight. There was nothing of interest in the suitcase, but in the briefcase the agents found a Toshiba laptop computer and a printout of Mapquest directions from the airport to the IHOP restaurant in Riverdale where

---

[6] The government was not able to determine whether this fourteen-year-old existed. Nor could it identify the mother and daughter from Toronto with whom Farley had supposedly chatted on webcam, and Farley claimed he made them up too.

Farley had agreed to meet Stephanie and Sydney. Also in the briefcase were Mapquest directions from the airport to the hotel, and from the hotel to the next morning's business meeting site, as well as documents for the business meeting.

Toward the end of the interview, the agents asked Farley if he would cooperate by consenting to a search of his laptop computer, his Blackberry handheld device, his T-Mobile cell phone, and his Yahoo! account. When Farley expressed concern about needing his computer for his business meeting, Agent Paganucci offered to copy whatever files he needed onto a disk for him. Farley agreed to the search and signed "Consent to Search" forms for each item.

Forensic examination of the laptop would later reveal about 100 images of children ranging from toddlers to early teens engaging in sexual activity including oral, vaginal, and anal penetration.[7] At least 10 of these images showed girls who appeared to be the same age as "Sydney." Most of the images had been deleted, and it was impossible to tell whether Farley had deliberately downloaded them or whether his internet browser had cached them automatically when he viewed them on a website. However, at least one image appeared to have been obtained through

_____

[7] The FBI's computer forensic examiner described the images only as "suspected" child pornography because none of them matched known child pornography images or known child victims already in the government's database. From how those images are described in the record, however, there seems to be little or no doubt that they are child pornography. The record establishes that an agent reviewed the images and determined that they showed sexual acts involving children. For whatever reason, Farley was not charged with possession of child pornography.

a file sharing program. Some of the images bore date stamps indicating they had been saved onto Farley's computer on March 23, 2007; for the others, date and time information could not be recovered. The laptop also contained evidence of Farley's chats with Stephanie and electronic versions of the same Mapquest directions he had printed and brought with him to Atlanta.

## B.

On June 12, 2007, a grand jury in the Northern District of Georgia indicted Farley on two counts. Count One charged that on May 15, 2007, he had knowingly crossed "a State line" with intent to engage in a sexual act with a person under the age of twelve, in violation of 18 U.S.C. § 2241(c). Count Two charged that between October 3, 2006 and May 15, 2007, Farley had used a computer connected to the internet, a facility of interstate commerce, and with it had knowingly attempted to persuade, induce, entice, and coerce a person under the age of eighteen to engage in sexual activity for which Farley could be charged with the criminal offense of child molestation under Georgia state law (O.C.G.A. § 16-6-4), in violation of 18 U.S.C. § 2422(b). He pleaded not guilty.

## C.

Farley moved to dismiss the indictment on two grounds. One was that the absence of an actual child made it legally impossible for him to commit the

24

charged crimes. The district court rejected that contention because it was foreclosed by binding precedent. See United States v. Root, 296 F.3d 1222, 1227–29 (11th Cir. 2002); see also United States v. Murrell, 368 F.3d 1283, 1286–88 (11th Cir. 2004). The second ground of the motion to dismiss contended that Farley's communications with "Stephanie" were protected speech under the First Amendment. The district court also rejected that contention as contrary to circuit precedent. See United States v. Hornaday, 392 F.3d 1306, 1311 (11th Cir. 2004).

Farley also filed motions to suppress his post-arrest statements and all the evidence obtained from the search of his computer, contending that Agent Paganucci's deceptive statements about the purpose of the questioning had rendered Farley's Miranda waiver and consent to search involuntary. After conducting an evidentiary hearing, the magistrate judge issued a report and recommendation that the motions to suppress be denied. The report noted that it was unclear whether Paganucci's remark about terrorism came before or after Farley was advised of his rights, but concluded that regardless of the timing Farley's waiver was voluntary under the totality of the circumstances. The magistrate judge reasoned that any initial misrepresentations by the agents did not affect the validity of Farley's consent to search because he had given that consent

25

toward the end of the interview when he was well aware of what the investigation was actually about. Farley objected to the magistrate judge's report and recommendations about the motions to suppress, and he requested a de novo evidentiary hearing before the district court in order to clarify the timing of Paganucci's statements and Farley's waiver.

The district court declined to order a new evidentiary hearing and denied Farley's motion to suppress his post-arrest statements. Because Agent Paganucci had testified at the hearing before the magistrate judge that he could not recall the timing of his "deceptive" statements in relation to the waiver, a second round of testimony would be unlikely to clarify the matter. In any event, the district court reasoned that the timing of those statements did not matter. Even if they had occurred before Farley was advised of his rights, his Miranda waiver was knowing and voluntary under the totality of the circumstances, and all of his own statements came after that waiver.

Farley also objected to the warrantless search of his briefcase, an issue the magistrate judge had not addressed because the parties had not mentioned it at the evidentiary hearing. Because he was not yet formally under arrest and had not yet given any consent when those bags were searched, Farley argued, the search was improper and the printed Mapquest directions found in the briefcase should be

excluded. Had the agents not opened the briefcase and seen a laptop inside it, they would not have known to ask him for consent to search the laptop. Therefore, he contended that everything found on the laptop should also be excluded as "fruit of the poisonous tree." The district court concluded that Farley had been arrested when the agents detained him on the plane and that the search of his briefcase was permissible. Therefore, the printed Mapquest directions were admissible and consent to search the laptop was validly obtained.[8]

The government anticipated that Farley would claim at trial that he had not actually intended to have sex with a child, and it wanted to put into evidence the child pornography found on his computer to show that he had an "unhealthy or prurient interest" in sex with children. So the government gave notice that it intended to offer the child pornography from Farley's laptop either as inextricably intertwined evidence or as extrinsic evidence of his intent under Fed. R. Evid. 404(b). Farley responded with a motion in limine to exclude the child pornography images, arguing that their probative value was outweighed by their prejudicial impact because the government could not prove exactly how they had gotten onto his computer and because the criminal intent for a child pornography

---

[8] Farley had also moved to suppress any evidence obtained from the search of his suitcase, but that issue was mooted by the fact that no evidence was obtained from it.

offense was not the same as the intent required for the crimes with which he was charged.

After the government indicated that it would limit its offer of the child pornography evidence to only those images depicting girls of similar age to Farley's intended victim, the court preliminarily ruled that those images were admissible as evidence intrinsic to the charged offenses and denied Farley's motion to exclude them. During the trial itself, when the issue arose again, the court allowed the government to introduce ten of the images.

Meanwhile, Farley sought to introduce two pieces of evidence he said would help prove that he lacked any intent to have sex with a child. He filed notice of his intent to introduce the results of a polygraph examination he had taken several months after his arrest. The examiner, hired by Farley, found no deception indicated when Farley answered "No" to the question "When you arrived at the Atlanta airport on May 15th, were you planning to engage in sexual activity with a child under the age of twelve?" Farley did not inform the government or the court about the polygraph until after being told that he had passed it. Farley also wanted to introduce the results of an investigation by the Texas Department of Family and Protective Services, which found no evidence that he had sexually abused any of

his own children.[9] Farley argued that report was relevant because it showed he was not a pedophile. The government opposed admission of the polygraph on grounds that it was unreliable and irrelevant, and it moved in limine to exclude the Family Services report as hearsay and irrelevant.

The district court noted that it would have required a <u>Daubert</u> hearing before allowing a jury to hear about the polygraph, but there was not going to be a jury. Farley waived his right to a jury and requested a bench trial before the district court. The government did not object, and the district court granted the request. Since the court was going to be the factfinder, it decided to hear the government's challenge to the scientific validity of the polygraph and the evidence about the results of the examination at the same time. The court excluded as irrelevant the Texas Family Services report but made a finding that Farley had not molested his own children.

**D.**

Farley's bench trial commenced on April 23, 2008, and lasted two and a half days. During it Farley conceded that he was the author of the chats and emails and that the chat transcripts were accurate, and stipulated that he had used a computer

---

[9] Soon after learning of Farley's arrest, his wife called the Texas Department of Family and Protective Services to report that he may have sexually abused their children. On July 6, 2007, the Department formally "ruled out" the allegation of abuse, meaning that its staff had "determined, based on available information, that it is reasonable to conclude that the abuse or neglect has not occurred."

connected to the internet, a facility of interstate commerce, to communicate with Detective Southerland. The sole issue at trial was whether Farley actually intended to have sex with the child, "Sydney," or was merely engaging in an "internet fantasy." Detective Southerland testified about Farley's communications with her as "Stephanie," going through them in chronological order and quoting them extensively. The chat transcripts, offline messages, and emails were admitted into evidence, and the recordings of the phone conversations were played for the court. The printed Mapquest directions found in Farley's briefcase, which showed him how to get from the airport to the IHOP restaurant in Riverdale where he was to meet Stephanie and Sydney, were also put into evidence.

After defense counsel suggested in cross-examination that Southerland had been the one to steer the conversations toward sex, she clarified on redirect that when playing the "Stephanie" role she had never said anything sexual about her fictional daughter until someone with "those interests" raised the topic.

Agent Paganucci testified about Farley's arrest and his post-arrest statements, which we have already summarized. A computer forensic examiner for the FBI testified about his examination of the laptop and introduced ten child pornography images he had found on it, images which depicted children similar in age to Sydney engaged in sexual acts. Those images were selected from a group of

30

about 100 recovered from the laptop, showing "minor children from approximately 2 years old to early teens involved in illegal sexual contact including oral sex, vaginal and anal penetration."

The government then rested. The court denied Farley's Rule 29 motion for judgment of acquittal, finding that there was sufficient evidence for a reasonable factfinder to find him guilty beyond a reasonable doubt.

In his own defense Farley took the stand and attempted to explain away the evidence against him. He admitted spending several hours a week in sexually themed chat rooms, but said he never met with any of his chat partners in person because what he wanted was online anonymity without any expectation of meeting "for real." Farley explained that he went to the chat rooms to escape from the real-world pressures of job and family. He insisted that when he met Stephanie in the "incest" room and asked her whether she was sexually active with her daughter, he was just trying to find out Stephanie's "fantasies" so that he could play along with them. His story was that he believed Stephanie was merely engaging in online role-playing, and he assumed that she either did not have a daughter or if she did was not actually doing anything sexual with her, because "anybody can be anybody" on the internet. Even though Farley had repeatedly assured Stephanie that he was "for real," that was just part of his act. When he instructed Stephanie

31

to make sure Sydney knew not to tell anyone about the molestation, he was just role-playing. Every time he expressed worry about encountering police or TV cameras, that too was just a reflection of the "taboo nature" of the fantasy, the kind of thing he thought Stephanie wanted to hear because it was the kind of thing a person who wanted to have sex with an eleven-year-old would say.

Farley insisted he was not actually interested in sex with the child and that he only pretended that he was because he was attracted to Stephanie and did not want her to lose interest in him. He felt like they had "hit it off" and developed a real relationship; they spent a lot of time in their chats talking about things other than sex with children. However, he had no expectation of meeting her in the flesh. His true objective in the chats, he testified, was to get Stephanie to masturbate for him while he watched her on webcam—even though he could not specifically identify any point in seven months' worth of chat transcripts at which he had asked her to do that. Farley admitted sending an email addressed directly to Sydney that referred to sexual activity, but said he did not think Stephanie would actually show the email to her daughter. Sending the picture of his penis was just a "spur-of-the-moment thing."

Even though Farley told Stephanie he was coming to Atlanta on the evening of May 15th, and had arranged to meet her and Sydney at the IHOP restaurant in

32

Riverdale, he testified that he had no intention of actually showing up for their meeting. Given that story, Farley had some difficulty explaining how the printed Mapquest directions to the restaurant had found their way into his briefcase. He admitted that he had purposely looked up the directions online, but thought he must have accidentally printed them and then accidentally grabbed them from the office printer along with a stack of other documents for his business meeting.

On cross-examination Farley could not explain why, if he wanted nothing more than an anonymous online relationship, he had told Stephanie his real name and true details about his family and his job. Nor was he able to explain why he was so attracted to a woman who told him she wanted to have sex with her own child, if he himself did not share that desire. Farley's disavowal of sexual interest in children was undermined by evidence of his membership in online groups like "tiny puffy,"[10] in which he had sent an email to a fellow member saying "great pics . . . I would love to see more of that age," and "kinky kids." He also sent an email to another Yahoo! user with "pussy sex children" in the subject line. Farley was also forced to admit he had joined a teen social networking site called "E-Spin the Bottle," where his profile identified him as a seventeen-year-old boy named

---

[10] This term apparently describes the physical appearance of the developing breasts of young adolescent girls, although Farley claimed he thought it referred to adult women with small breasts.

"Michael Johnson" who wanted to meet white females of "age range 13 to 17."

And he had to admit that he encouraged Stephanie to show her daughter

pornographic movies and teach her how to masturbate, although he insisted he did

not expect her to do it. Finally, he conceded that during the time they were

communicating he could not be entirely certain Stephanie was not actually

molesting a real child at his urging.

Farley presented two other witnesses in his defense. James Partin, a former

executive at Dalrada, testified that the reason Farley was laid off by that company

was not the charges on his company debit card for pornographic web sites.

Polygrapher Mark Foster testified about his examination of Farley. Foster

admitted that polygraphy was "part science, part art." The defense then rested, and

the court again denied Farley's Rule 29 motion for a judgment of acquittal.

After hearing closing arguments, the district court announced its factual

findings and verdict. See Fed. R. Crim. P. 23(c). The court started with Count

Two, which charged a violation of 18 U.S.C. § 2422(b), because it felt that count

was the more straightforward of the two. The court found beyond a reasonable

doubt that Farley had persuaded, induced, or enticed an individual under the age of

eighteen to engage in sexual activity, or had attempted to do so, and that he had

done so knowingly—"voluntarily and intentionally and not because of a mistake or

34

accident." The court observed that it had "very little trouble finding beyond a reasonable doubt that [he did believe] there was a real child and that this child was under the age of 18." The court explained that Farley's testimony that it was all a fantasy for him "does not comport with the evidence in the case," including the fact that he had used his real name, his real job, and had given real information about this family; he had told "Stephanie" that his children played soccer and that he had been to Georgia on soccer trips with them, which was true; and he had conceded in his testimony "that the relationship had evolved into a relationship, an affair." The court was satisfied beyond a reasonable doubt that Farley's instruction about "how to groom the child sexually was done in anticipation of his own sexual contact with the child," which, had it occurred, would have been a criminal offense under the laws of Georgia. And all of this, the court repeated, had been done knowingly and willfully instead of by mistake or accident.

Having found Farley guilty under Count Two, the court turned to Count One, which charged a violation of 18 U.S.C. § 2241(c). It had no problem finding that Farley had knowingly crossed the state line, which left the question of intent. The court reiterated its earlier findings that Farley believed there was an actual minor child as evidenced by the fact that he spoke to the child and sent an email to her, and also by his inquiries about the child's physical development. On the

35

question of intent, the court indicated that if it had been a jury trial, the testimony of the polygraph examiner would have been excluded under the <u>Daubert</u> test and also because it would not be helpful to the factfinder. Instead of formally excluding that testimony, the court simply said that the polygrapher's testimony "does not weigh heavily in my evaluation of the evidence in this case."

The court rejected Farley's testimony that he did not intend to travel to the IHOP to meet the mother and daughter. It found his testimony to be inconsistent and not credible. Among other things, the court asked, if Farley had not intended to meet the mother and her child why did he tell her that he was coming to Atlanta in the first place? "Paramount" to the court's evaluation of Farley's credibility was his implausible explanation of how the printed Mapquest directions ended up in his briefcase. The court found that story incredible and reasoned that it tainted Farley's credibility as to the other things that he said. The court finished up its findings with the following:

> I found beyond a reasonable doubt that he believed there was a real person with a real child. But I also think the evidence demonstrates that he couldn't have known for sure whether this person was going to show up or not or what was going to happen. But based on all of the considerations, and really largely my observations of Mr. Farley on the stand, and the things that he said, the things that he testified to under oath, that it was his intent to go to Ms. Southerland, Stephanie. And I also find that had Stephanie shown up and made the child available, that it was Mr. Farley's intent to sexually assault that child or participate in the sexual assault of that child. And based on those

36

findings I find, again, tragically, that Mr. Farley is guilty beyond a reasonable doubt of aggravated sexual abuse as that term has been defined, and that he is guilty of that crime, violating Title 18, United States Code, section 2241(c).

**E.**

Because Farley's criminal conduct took place after July 27, 2006, he faced the considerably more severe sentences for child sex offenses mandated by Congress in the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587 (2006). That Act imposed a mandatory minimum sentence of thirty years for crossing a state line to have sex with a child under twelve in violation of 18 U.S.C. § 2241(c). Id. § 206. It also raised the mandatory minimum sentence for using a computer to entice a minor, in violation of 18 U.S.C. § 2422(b), from five years to ten years. Id. § 203. The maximum sentence allowed by law for both crimes was life in prison. Id. §§ 203, 206.

On June 20, 2008, the Probation Office released its Presentence Report. It advised that Farley's base offense level was 30, to which were added four levels because the intended victim was under age twelve, and two levels because Farley used a computer. See U.S.S.G. § 2A3.1 (2006). Another two levels were added for obstruction of justice through perjury, based on the court's finding that Farley had not testified credibly when he said he did not intend to have sex with the child.

37

See id. § 3C1.1.  The additions gave Farley a total offense level of 38.  With no criminal history, he faced a guidelines sentence range of 235 to 293 months in prison.  (Without the obstruction enhancement, the offense level would have been 36 and the guidelines range would be 188 to 235 months.)  As the PSR acknowledged, however, the thirty-year mandatory minimum sentence for the 18 U.S.C. § 2241(c) conviction overrode the lower guidelines range.  Farley objected to the obstruction enhancement, arguing that his polygraph proved he did not lie on the stand.

**F.**

In a letter to the court, Farley confessed he suffered from an "addiction" to online pornography and fantasy chat rooms, and claimed that he was "sickened" by what he had written in the chats.  However, he insisted that he was innocent of the charges and had never intended to engage in sex with a child.  Farley complained that the government was more interested in getting a conviction for a "hot topic" crime than in doing justice.  He promised the court that if it showed him mercy, he would "use this situation for good" by speaking to church groups and men's groups about "the danger of sexual addictions and the internet."  He begged the court not to let his children grow up without a father.  Farley also asked the court

to consider the Texas Department of Family and Protective Services' finding that he had not molested his children.

Farley submitted to the court letters of support written by his mother and father, his aunt and uncle, and one of his six children, the nine-year-old daughter. Farley's mother described him as "very devoted to his children and his wife," and a "loving and very active father" who, together with his wife, had done an "amazing job" with their children. Even though she read the chats and heard the trial testimony, Farley's mother could "not believe that [he] would ever harm anyone, especially, a child" and "still believe[d] in [her] heart" that he would not have met with Stephanie. Nevertheless, she admitted that her son had a "serious addiction to pornography." After "hearing all the testimony and seeing the amount of time spent in chat rooms," she had a "better understanding" of the family's financial problems. Farley's mother could not understand how a thirty-year sentence could be "fair and just" for Farley, who had never harmed anyone, when murderers and rapists often got less.

Farley's father, who admitted he had not been close to his son for many years, blamed business failures, the "pressures" of supporting five children, and criticism from in-laws for driving Farley to become a "sex addict." He believed that his son needed professional mental health counseling to "cleanse his mind and

soul," and said that "[o]nly God and Kelly know" what Farley's intent was when he boarded the flight to Atlanta. Farley's aunt and uncle sent a short letter praising him as a "good family member" and a "good member of his church." Farley also submitted letters written to him by his nine-year-old daughter, in which she said that she loved him and missed him.

Farley's family support, however, was far from unanimous. When he flew to Atlanta to have a sexual tryst with a mother and her eleven-year-old child, Farley had left at home in McKinney, Texas his five children and a wife, who was only weeks away from delivering their sixth child. Before the sentence hearing a year later, Farley's wife wrote the court to give it "a clear and truthful picture of me and my kids" who were struggling to survive the economic and emotional harm that Farley had inflicted on them by committing this crime. The fact that, while a father and husband, Farley "was also spending countless hours talking to other women and about hurting children" was "unnerving" to her, and she said that the "level of betrayal is almost more than anyone can bear." Although his nine-year-old daughter had written to support Farley, his wife wanted the court to know that the little girl was too young to understand what her father had done, and that because of the crime he had committed the older children were angry at Farley, afraid of him, and embarrassed. His behavior had devastated the family and left

them penniless. Farley's wife was left in such dire financial straits that she had only recently been able to file for divorce and "put other safety measures in place that I need and my children have asked me to do as well."

Farley's mother- and father-in-law wrote to the court describing the pain he had caused his wife and children, which "goes on and on," and urging the court to "sentence him to the full letter of the law." His sister-in-law also wrote the court a letter describing all the hurt Farley had caused his wife and children, a letter that closed: "He is a child predator, the worst of his kind, and deserves the sentencing mandated by the two charges he's been found guilty of."

## G.

Farley submitted for the court's consideration at sentencing the results of a confidential psychosexual evaluation that he had commissioned several months before trial, which concluded that he did not meet the diagnostic criteria for pedophilia and that he posed a low risk of re-offending. Because that report seems to have influenced the district court's ruling on the constitutionality of imposing the § 2241(c) mandatory minimum sentence on Farley, which is one of the issues in this appeal, we will discuss the report in some detail.

Dr. Candice Osborn of the Behavioral Medicine Institute of Atlanta, who had twenty-five years of experience evaluating and treating sex offenders,

interviewed Farley on September 19, 2007, and completed her report on November 16, 2007. Before speaking to Farley, Dr. Osborn reviewed Detective Southerland's affidavit and read the chat transcripts and emails. She also reviewed Farley's polygraph results and his own written narrative of the events leading up to his arrest. Her summary of those events largely followed the government's allegations, although she noted where Farley's version of the story differed.

During the interview, Farley told Dr. Osborn about the evolution of his sexual interests. He had a normal childhood and was never abused. He said that he was first exposed to pornography at age twelve or thirteen when he found a magazine in a dumpster, and learned how to masturbate at age sixteen when he saw it on an adult video. In college, he regularly looked at adult magazines and videos. He stopped subscribing to Penthouse when his wife objected, but continued to view pornography in secret. He owned a snack-vending business in the early 1990s; one of his customers was an adult book store, and he sometimes traded snacks for pornography. He spent two or three hours a week looking at the magazines in his office, sometimes masturbating when other employees had left for the day. The magazines "expanded his horizons" about different types of sex. Farley and his wife had sex less and less frequently; he said that was her fault because she put taking care of their young children ahead of his own needs. In

42

1994 or 1995, Farley discovered that he could find pornography on the internet from the computer in his office. He claimed he was mainly interested in pictures of adult heterosexual and lesbian couples. When the family moved to Atlanta in 1994, Farley discovered online chat rooms. He spent four or five hours a week in rooms dedicated to "married and flirting" and "fantasy role-playing." One day, his wife found the chats on his computer and became very upset. They sought counseling from their pastor, who told Farley that he was being selfish and hurting his marriage. Farley thought the pastor was "arrogant" and saw no harm in the chats. He was frustrated that his wife only wanted regular intercourse and would not "experiment" with other forms of sex. For some time after that incident, his wife regularly questioned him and checked his computer. She eventually stopped doing that, however, and Farley resumed viewing pornography and chatting online.

After the family moved back to Dallas in 2005, Farley spent more and more time in sexually oriented chat rooms. He described the chat participants as a "reverse support group" of people who were non-judgmental and who accepted his sexual interests. Even so, he felt "guilty, dirty and angry with himself" for his actions. He talked on the phone with a few of the women he met online. Once he met a woman in the "married women looking for sex" chat room and then met her in person for lunch, but he did not have sex with her because he felt guilty. Farley

also participated in an online "role-play" where he pretended to be a college professor having sex with an eighteen-year-old student. He joined several Yahoo! groups related to various fetishes "such as panty hose, animals, etc." Other members of those groups would email him sexually explicit pictures, and sometimes he would have to click on a hyperlink before he could see what was in the picture. (This was Farley's explanation for how he might have accidentally received the child pornography found on his laptop computer.)

Farley claimed he had no idea that the "Fetish 14" chat room where he met Stephanie was a meeting place for pedophiles. He knew the room's focus was "older males with younger females," but he thought this meant females aged eighteen to twenty-one. When Stephanie told him she was interested in ten-year-old girls, Farley played along only because he was attracted to Stephanie herself. He never considered any of it to be real, and he was "numb" to the idea of sex with a ten-year-old.

Dr. Osborn administered a number of psychological tests. The Minnesota Multiphasic Personality Inventory and the Millon Clinical Multiaxial Inventory, two tests that evaluated the subject's personality and mental health through a series of true/false questions, indicated that Farley did not suffer from any major psychiatric disorder. However, the test results were of "marginal validity" because

44

Farley was defensive and "attempted to place himself in an overly positive light by minimizing his faults." That was not unusual for someone who had been accused of criminal behavior. Farley's profile suggested a "veneer of sociability, maturity, and self-assurance" that cloaked a "fear of genuine autonomy" and a "deep antagonism." The Millon test results described Farley as "alert to the thoughts of others" and therefore "able to appraise what actions will attain his ends." He had developed a "highly adaptable lifestyle" and could "modify[] his behavior to the desire of others." Although it was within normal limits, Farley's profile suggested "narcissistic personality traits."

On a "Sexual Addiction Screening" questionnaire, Farley gave answers indicating that he viewed his sexual behavior as compulsive and out of control. The Abel Questionnaire for Men was an extensive 446-item survey about various deviant sexual behaviors, all based on self-reporting. Farley admitted to looking at transsexual and voyeuristic pornography and arranging to meet adult women for sex, but denied engaging in child molestation or any other deviant behavior, and denied having any sexual fantasies about or interest in children. The Abel test included a "cognitive distortion" component, which measured justifications and excuses frequently used by child molesters. Farley scored 8% on this measure, which was in the low range, indicating not a high cognitive distortion. The "social

desirability" subscale measured the subject's unwillingness to admit to violations of social mores. Farley scored 65% on this measure, which might indicate an "inability or unwillingness to respond truthfully to others."

Dr. Osborn also administered a Reaction Time Assessment. In this test the subject is shown slides of partially clothed models wearing bathing suits or underwear, who represent both sexes and different races, and who range in age from toddlers to pre-adolescents to mid-teens to adults. The subject is asked to self-report his sexual interest in each picture while his visual reaction time is measured objectively. Farley's objective results showed significant interest in adult and adolescent females, and "insignificant" interest in girls under ten or in males of any age. This was consistent with his self-reporting that he found the adult and adolescent females "mildly arousing" and the other models "highly sexually disgusting," and was consistent with typical results for adult heterosexual males.

Finally, Dr. Osborn performed a Static-99 Risk Assessment. This was not a test, but an actuarial calculation of recidivism risk based on known facts about the offense, the offender's prior record, and the offender's relationship with the victim. Farley scored a 1, the lowest risk category, because he had no previous offenses and his intended "victim" was not related to him. Offenders with the same score

46

are only 6–7% likely to be convicted of another sex offense within fifteen years of their first conviction. Based on his Static-99 score, Farley was not a "sexual predator" for purposes of Georgia's sex-offender registration law.[11]

Dr. Osborn concluded that Farley did not meet the diagnostic criteria for "pedophilia" as defined in the Diagnostic and Statistical Manual of Mental Disorders, because Farley did not admit having "recurrent, intense, sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child, over a period of at least six months." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders § 302.2 (4th ed. text rev. 2000) (DSM-IV TR). Dr. Osborn reached that conclusion even though she had read seven months' worth of chat transcripts in which Farley had repeatedly told a woman he thought was a mother that he wanted to have sex with her prepubescent child. (Apparently, a formal diagnosis of pedophilia from Dr. Osborn would not be possible unless Farley actually had sex with a child, or admitted to a psychiatrist—rather than to an undercover police officer—that he really wanted to.)

Even though Dr. Osborn was of the opinion that Farley presented a low risk of re-offending and did not meet the DSM-IV criteria for pedophilia, in light of his

---

[11] The Georgia Sex Offender Registration and Review Board classifies anyone scoring 5 or higher on the Static-99 as a "dangerous sexual predator[]." As discussed below, however, the definition of "sexual predator" varies widely across different jurisdictions. See infra p.57.

"extensive history of viewing pornography and accessing sexually oriented chat rooms" she recommended that he participate in a specialized sex offender treatment program. Such a program should include "odor-aversion therapy," "satiation" to replace deviant thoughts with normal fantasies, sensitization to the consequences of his behavior, empathy for sex-abuse victims, cognitive restructuring, anger management, intimacy training, and relapse-prevention strategies. Dr. Osborn predicted that if Farley received all of that treatment, he would not pose a significant risk to the community. She recommended: that the treatment be required as part of his supervised release; that Farley be restricted from unsupervised interaction with children other than his own, or living near places where children congregated, or coaching children's sports; and that he be required to take periodic polygraphs and install monitoring software that would restrict his access to sexually explicit websites.

**H.**

In his sentencing memorandum Farley asked the district court for a downward variance from the guidelines range based on his lack of criminal history, the Texas Department of Family and Protective Services' finding that he had not abused his own children, Dr. Osborn's conclusion that he was a low re-offense risk, and his role as sole breadwinner for his wife and six children. None of these

48

arguments for leniency would do him any good, of course, as long as the sentencing court was bound by the thirty-year mandatory minimum imposed by 18 U.S.C. § 2241(c). So Farley challenged the constitutionality of the mandatory minimum, contending that imposing a thirty-year sentence on him would violate the Cruel and Unusual Punishments Clause of the Eighth Amendment. He argued that thirty years was a grossly disproportionate punishment given his lack of criminal history and the fact that it turned out there was no actual child victim. The mandatory minimum severely restricted the consideration the court could give to those or any other mitigating factors and, he asserted, the resulting sentence would be disproportionate compared to the guidelines' recommendation and to state-law sentences for similar crimes.

Farley pointed out that some states imposed mandatory minimums as low as one year, or none at all, and if he had been prosecuted by the state of Georgia for conduct occurring entirely within that state, he would have faced a minimum sentence of only one year. He complained that it was arbitrary for his use of a computer to require a minimum sentence of ten years and his crossing state lines to require one of thirty years.

The district court ordered more briefing on the Eighth Amendment issue. In the order doing so, the court found it "informative" that another interstate travel

crime, crossing state lines with intent to commit murder for hire, carried a maximum penalty of only ten years. See 18 U.S.C. § 1958(a). The court also questioned whether Congress had really intended the harsher mandatory minimums to apply to crimes "when no actual sexual act was carried out."

In its brief the government argued that Congress was owed great deference in legislating punishment, and pointed to the Supreme Court's admonition in Solem v. Helm, 463 U.S. 277, 289–90, 103 S.Ct. 3001, 3009 (1983), that successful Eighth Amendment challenges should be "exceedingly rare" in noncapital cases. Farley's brief responded that the decisions cited by the government involved defendants who, unlike Farley, either molested actual children or had lengthy prior criminal records. He argued that the defendant's criminal history, or lack thereof, is a relevant factor in weighing the gravity of the offense under Eighth Amendment proportionality analysis. See Ewing v. California, 538 U.S. 11, 29, 123 S.Ct. 1179, 1189–90 (2003). Inexplicably, neither party ever brought to the district court's attention the Supreme Court's decision in Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680 (1991).[12]

---

[12] At oral argument before this Court, the government opened by saying that "the resolution of this appeal starts and ends" with Harmelin. The Assistant U.S. Attorney, who had not written the government's brief in the district court, admitted that "we missed it and we shouldn't have" and recognized that "we did not do the service to the district judge that we should have done in pointing out that case to her."

50

Because the nature and range of sentences available would be affected by its decision regarding the constitutionality of applying the thirty-year minimum sentence mandated by 18 U.S.C. § 2241(c) to the case, the district court decided that issue before conducting a sentence hearing. In its order on the issue the court examined the legislative background to § 2241(c), noting that the section of the Adam Walsh Act that amended § 2241(c) was titled "Aggravated Sexual Abuse of Children" and that congressional debate on the Adam Walsh Act appeared to address only crimes involving actual aggravated sexual abuse of a child. Though acknowledging that legislative history was not a necessary part of Eighth Amendment analysis, the court still thought it significant that Congress had not engaged in a "meaningful discussion" of whether the same penalties should apply to crimes of intent or attempt that did not involve actual harm to children.

The court then compared the gravity of the offense to the harshness of the penalty, in order to determine whether Farley had made a threshold showing of gross disproportionality. See Solem, 463 U.S. at 290–91, 103 S.Ct. at 3010. The court believed that 18 U.S.C. § 3553(a)(1) required it to consider the nature and circumstances of the offense, and the history and characteristics of the defendant, as part of its proportionality analysis. It considered Farley's lack of any criminal record or prior history of improper behavior with children, and Dr. Osborn's

findings that Farley "was not attracted to prepubescent children," was not a "sexual predator," and posed a low risk of future sex crimes. The court noted that up to that point the government had not contested any of Dr. Osborn's findings and did not seek its own psychosexual evaluation. Although it acknowledged the serious nature of Farley's conduct, the court thought it "far less grave" than crimes that harmed or threatened to harm an actual child, or crimes committed by "perpetual offenders" who posed a continuing threat to the public. The court concluded that a thirty-year sentence was "extremely harsh" and "grossly out of proportion" to Farley's offense.

Next, the court undertook a comparative analysis. See Solem, 463 U.S. at 291, 103 S.Ct. at 3010. The court noted that § 2241(c) applied the same mandatory penalty to a wide range of criminal behavior that covered everything from actually raping a child to merely crossing a state line intending to touch a child sexually. For that reason, the court believed that the penalty was "disproportionate" as applied to the lesser criminal conduct it covered. Other federal statutes punishing child-related sex offenses either did not impose a mandatory minimum at all, e.g., 18 U.S.C. § 2244 (sexual touching short of a sexual act), or § 2245 (murder in the course of a sex offense, which does carry a possible death sentence); or they imposed shorter mandatory minimum terms, e.g., § 2423(a) (minimum 10 years for

52

interstate transportation of a child to engage in criminal sexual activity), § 2251(a), (e) (minimum 15 years and maximum 30 years for enticing a minor into sexual activity for purposes of producing a visual depiction), or § 2252 (minimum 5 years and maximum 20 years for distributing child pornography); or imposed the same mandatory minimum sentence for much more serious conduct, e.g., § 2251(e) (minimum 30 years when enticement of a minor results in death), or § 2251A (minimum 30 years for buying or selling a child for the purpose of producing child pornography).[13]

The court decided that Farley's sentence was also disproportionate when compared to the penalties for other interstate travel crimes, e.g., § 1958(a) (maximum 10 years for crossing state lines with intent to commit murder for hire). Other federal statutes that imposed thirty-year minimum sentences did so to punish far more dangerous conduct, such as attempting or threatening to use weapons of mass destruction, §§ 175c(c)(2) (smallpox virus), 2332g(c)(2) (anti-aircraft missiles), 2332h(c)(2) (radioactive weapons), or the use of machine guns or firearm silencers in crimes of violence or drug trafficking, § 924(c)(1)(B)(ii).

---

[13] Because § 2251A criminalizes a mere "offer" to buy a child, not just an actual sale, it might appear that crime is not significantly worse than what Farley attempted to do. He told "Sydney" that he planned to take pictures when he molested her. The district court, however, judged the crime forbidden by § 2251A to be more serious because, as the court explained, it involves an "intended transfer of custody or control," not just an "intended isolated sexual act" against the child.

Finally, the court was convinced that the thirty-year sentence was disproportionate when compared to state-law sentences for attempted child sex crimes.[14]  In most states, the maximum sentences available for such attempts ranged from as low as 3 years to as high as 30 years.  Georgia, the location of the intended victim and site where the sexual abuse would have taken place, would impose a minimum of 1 year and a maximum of 10 years; Farley's home state of Texas would impose a maximum of 20 years.  See O.C.G.A. §§ 16-6-4, 16-4-6(b); Tex. Penal Code §§ 12.33, 22.011, 15.01.  A few states made no distinction between attempts and completed crimes and therefore imposed heavier penalties, but the statutes doing so applied only when there was sexual intercourse with a child, not sexual acts "short of intercourse."  The court noted that when it convicted Farley it had determined only that he intended to engage in a "sexual act" with a child, not necessarily that he intended intercourse.[15]  For all of those reasons, the court concluded that the thirty-year mandatory sentence was grossly

---

[14] Of course, "crossing a state line with intent" is a uniquely federal crime.  The district court thought the closest state-law analogue would be statutes criminalizing attempted sexual abuse of a child.

[15] In making this distinction, the court did not discuss Farley's May 4, 2007 email, which appears to make clear his intent to have sexual intercourse with the eleven-year-old Sydney.  In any event, § 2241(c) subjects sex predators who are caught in a sting operation attempting to have sex with a child to the same penalties as those who succeed in doing so.  Cf. United States v. Root, 296 F.3d 1222, 1231–32 (11th Cir. 2002).

disproportionate to Farley's § 2241(c) offense and disproportionate in comparison to other sentences, and therefore unconstitutional as applied to him.[16]

On the same day as the sentence hearing, the government filed a motion for reconsideration of the court's ruling. That motion launched a thorough attack on Dr. Osborn's opinions. It pointed out that her report had acknowledged that Farley's "inability or unwillingness to respond truthfully" called into doubt some of his test results. The government argued that the Reaction Time Assessment was not scientifically reliable and that its result here was obviously wrong because Farley's conduct proved that he was interested in sex with a prepubescent girl. The Static-99 assessment of recidivism risk was flawed, the government insisted, because it only counted prior or subsequent offenses if they resulted in convictions, even though most incidents of sexual abuse go unreported and offenders often admit to committing many more crimes than they were convicted for. Also, the Static-99 assessment was developed in the pre-internet era and its applicability to online offenders is unclear. See United States v. McIlrath, 512 F.3d 421, 424–25 (7th Cir. 2008) (discussing limitations of the Static-99). The government argued that Dr. Osborn's conclusion that Farley is not a sexual predator was not supported

---

[16] The court's order left undisturbed the ten-year mandatory minimum sentence Farley faced under § 2422(b) for his conviction on the other count.

by any data or test results, and that it was contradicted by his actual conduct and the crimes for which he had been convicted.

## I.

As part of its effort to get the court to change its ruling on the constitutionality of the thirty-year mandatory minimum sentence as applied to Farley, the government called Dr. Osborn as a witness at the sentence hearing. She conceded that while the Reaction Assessment Test had passed <u>Daubert</u> review in some jurisdictions, it also had been rejected in others. The government brought out that the coding manual for the Static-99 assessment included a disclaimer stating that it had only "moderate predictive accuracy" and did not incorporate all the factors that might be relevant to a "wide-ranging risk assessment." Dr. Osborn admitted that and the fact that she had not mentioned that disclaimer in her report. She also admitted that the recidivism percentages for different Static-99 scores were merely group estimates, not a direct prediction of an individual offender's risk. The original data on which those percentages were based predated the internet, although the current manual does discuss how to apply the Static-99 to online offenders.

The government challenged Dr. Osborn's conclusion that Farley was not a "sexual predator." The Association for the Treatment of Sexual Abusers, a

professional organization to which Dr. Osborn belonged, defined "sexually predatory acts" as acts directed toward strangers or toward victims with whom the offender has established a relationship primarily for the purpose of victimization. Asked whether she agreed with this definition, Dr. Osborn answered that the term "sexual predator" was defined differently in every jurisdiction and said that she followed Georgia's sex offender registration system which based it on the offender's Static-99 score. Asked why Farley's cultivation of an online relationship with a woman for the purpose of molesting her daughter did not fit the ATSA's definition of a "sexually predatory act," Dr. Osborn said that she could not "measure intent." When pressed on this point, she conceded that Farley's conviction established his intent to have sex with the child when he went to Atlanta, but she could not say whether he already had that intent when he first started chatting with Stephanie. These assertions by Dr. Osborn were in defense of her refusal to say that Farley was a "sexual predator" under the ATSA definition, which only applies to one who establishes a relationship "for the primary purpose of victimization," rather than exploiting an existing relationship for that purpose.

The fact of Farley's conviction did not change Dr. Osborn's assessment, because she had been aware of the facts alleged by the government when she wrote her report. Even if Farley intended to have sex with an eleven-year-old girl, she

57

thought that did not necessarily mean he was sexually interested in children because "individuals can sexually molest children for a number of reasons other than having a significant sexual interest in children." She did not explain what those other reasons might be, or why someone motivated by them would pose less future danger to children than would a more typical sexual abuser of children. Likewise, she insisted that the presence of child pornography on Farley's computer did not necessarily indicate that he had a significant sexual interest in children. Dr. Osborn stood by her conclusions that Farley was not sexually interested in children, was not a sexual predator, and posed a low risk of re-offending. The government again asked the court to reconsider its constitutional ruling insofar as it had relied on Dr. Osborn's findings. The court declined, saying that it had found her report "helpful, [but] not conclusively so" and had relied on other factors as well.

With the thirty-year mandatory minimum out of the picture, the court proceeded to consider the guidelines and the sentencing factors under § 3553(a). The court was "uncomfortable" with using the obstruction enhancement in U.S.S.G. § 3C1.1 to punish a defendant for exercising his constitutional right to testify, and thought it debatable whether Farley's lie about the printed Mapquest directions was sufficiently material to be perjury. However, that lie was important

to the court in assessing Farley's credibility, which in turn was important to determining his intent, and for that reason the court did apply the obstruction enhancement.

Farley asked for "a reasonable sentence below the guideline range," based on his lack of criminal history, the findings in Dr. Osborn's report, and Farley's record as a "good father" to his children who was "very active in their lives" and "involved with their after-school activities." In response to a question from the government, the court acknowledged that it had received the letter from Farley's wife, but said that what the letter expressed "is Mrs. Farley's emotional response to this and her observations about this, and not necessarily anything about the evidence in the case." The government asked for a sentence within the guidelines, arguing that a severe sentence was needed for deterrence because so many abuse incidents were never reported; that Congress had treated this crime seriously because children were uniquely vulnerable; and that the internet made the problem worse by allowing people like Farley to find others who shared their deviant interests and giving them the ability to act on those interests.

Although the court had already denied the government's motion to reconsider its ruling on the constitutionality of the mandatory minimum sentence, it returned to the topic in explaining the sentence it was going to impose. The

59

court stated that it had initially set out to uphold the constitutionality of the mandatory minimum sentence, but after reviewing the punishment other statutes imposed for similar or more severe conduct, the court had been unable to escape the conclusion that a thirty-year sentence was disproportionately harsh in relation to Farley's conduct. The court regretted that the statute and guidelines did not treat offenders who had not actually molested children differently from those who had. Although there was, in the court's words, "a lot of talk and a lot of filth" in the record, it found no evidence Farley had ever touched a child in a sexual manner. At the same time, it was mindful of the things Farley said he wanted to do to a child.

The court concluded that a sentence at the low end of the guidelines range of 235–293 months was appropriate. It imposed what it described as "a very harsh sentence" of 235 months on each count, slightly less than twenty years, to run concurrently. The court also imposed a ten-year term of supervised release with a requirement that Farley participate in a mental health treatment program. It did not levy a fine, finding that Farley had no ability to pay one.

## III.

The government appealed from the sentence the district court imposed and specifically from its decision that the thirty-year mandatory minimum sentence for

violating 18 U.S.C. § 2241(c) is unconstitutional. Nine members of the House of Representatives, including several of the original sponsors of the Adam Walsh Act, filed an amicus brief urging this Court to uphold the constitutionality of the mandatory sentence.

Farley cross-appealed, raising four challenges to his conviction and one to his sentence: (1) the enticement statute was unconstitutionally overbroad under the First Amendment as applied to his sexual conversations with the adult "Stephanie"; (2) the lack of an actual child made it legally impossible for him to commit the charged offenses; (3) Farley's statements and the evidence from his computer and briefcase should have been suppressed, because his waiver of rights and consent to search was obtained by deceit, and because the warrantless search of his briefcase was improper; (4) the evidence of Farley's intent was insufficient to support a conviction on either count; and (5) the obstruction enhancement was improper because there was insufficient evidence for the court to find that Farley had given perjured testimony.

Because the first four cross-appeal issues involve the validity of Farley's convictions, we begin with them.

## A.

Farley first contends that 18 U.S.C. § 2422(b) is unconstitutionally overbroad as applied to his case, because he never said anything sexual directly to "Sydney" and because the First Amendment protects his sexually explicit conversations with the adult "Stephanie." We have already rejected this First Amendment argument as frivolous in a similar case in which another defendant chatted online with an undercover agent posing as the parent of a fictitious child. United States v. Hornaday, 392 F.3d 1306, 1311 (11th Cir. 2004). In doing so we said that "[s]peech attempting to arrange the sexual abuse of children is no more constitutionally protected than speech attempting to arrange any other type of crime." Id. We have also held that a defendant can be convicted under § 2422(b) for attempted enticement through an adult intermediary, even if he never communicated directly with anyone he believed to be a child. United States v. Lee, 603 F.3d 904, 914–16 (11th Cir. 2010) (defendant communicated with postal inspector posing as mother of twelve-year-old and seven-year-old girls); United States v. Murrell, 368 F.3d 1283, 1286–88 (11th Cir. 2004) (defendant communicated with undercover detective posing as father of thirteen-year-old girl). As we said in Murrell, "the efficacy of § 2242(b) would be eviscerated if a defendant could circumvent the statute by employing an intermediary to carry out

62

his intended objective." Id. at 1287. On the adult intermediary issue, the facts in this case are materially indistinguishable from those in Hornaday, Lee, and Murrell.

**B.**

Farley's second contention is that it was legally impossible for him to commit the charged crimes because there was no actual child. This contention is, as he concedes, foreclosed by precedent. The primary precedent on point is United States v. Root, 296 F.3d 1222 (11th Cir. 2002). We held in Root that convictions for attempted enticement under 18 U.S.C. § 2422(b) and for travel in interstate commerce with intent to engage in a sexual act with a minor in violation of 18 U.S.C. § 2423(b) do not require the existence of an actual minor victim. Id. at 1227–32. Root engaged in sexually explicit chats and exchanged instant messages with a person he believed to be a thirteen-year-old girl in order to persuade her to meet him for sex, and then he traveled across state lines to have sex with her. Id. at 1224–26. It turned out that the girl was actually an adult police officer. Id. Relying on the plain language of the statutory provisions Root was charged with violating, we rejected his argument that there could be no sexual crimes involving a minor where there was no minor. Id. at 1227; accord Lee, 603 F.3d at 913; United States v. Yost, 479 F.3d 815, 819 & n.2 (11th Cir. 2007) (per curiam);

63

Hornaday, 392 F.3d at 1309–11; Murrell, 368 F.3d at 1286–88; cf. United States v. Lebovitz, 401 F.3d 1263, 1268–70 (11th Cir. 2005) (upholding application of guidelines sentencing enhancements based on age of child victim even though no child existed).

Root clearly forecloses Farley's no-actual-child challenge to his conviction for attempted enticement under the same statute, § 2422(b). See Root, 296 F.3d at 1227–31. It also forecloses his same challenge to his interstate travel conviction under § 2241(c). That is true even though the travel conviction in Root was under 18 U.S.C. § 2423(b) and not § 2241(c). The two statutory provisions apply to different age categories of victims but they, and the defendants' conduct in the two cases, are materially identical.[17] Therefore, Root's reasoning about § 2423(b) applies to § 2241(c). See Root, 296 F.3d at 1231–32. Farley's conviction on both counts turns on the criminal intent with which he acted, not on the existence of an actual child. See id. at 1227, 1231.

---

[17] The fictional child in Root was older than eleven-year-old Sydney and thereby outside the cutoff age for § 2241(c), which is applicable only when the child is under twelve. When the intended victim is between twelve and fifteen years of age and the offender at least four years older, 18 U.S.C. § 2243(a) combines with § 2423(b) to prohibit travel in interstate commerce with the intent to engage in an illegal sexual act with that child. That is the crime for which Root was convicted. See Root, 296 F.3d at 1231.

## C.

Farley also contends that the district court erred in denying his motions to suppress his post-arrest statements and the evidence recovered from the searches of his laptop computer and briefcase. We apply a mixed standard of review to the denial of a suppression motion, reviewing the district court's findings of fact for clear error and its application of the law to those facts de novo. United States v. Glover, 431 F.3d 744, 747 (11th Cir. 2005) (per curiam) (motion to suppress statement); United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) (motion to suppress results of search). The voluntariness of a defendant's statement is a question of law. United States v. Barbour, 70 F.3d 580, 584 (11th Cir. 1995).

### 1.

Farley argues that because Agent Paganucci "tricked" him by telling him that the FBI wanted to question him as part of a terrorism investigation, his waiver of Miranda rights was not knowing or voluntary and therefore his post-arrest statements should have been suppressed.[18]

---

[18] The other deceptions Farley complains about were that Agent Paganucci may have told him that the questioning would take "about 45 minutes," when it actually took about an hour and a half, and did tell him that the agents were "waiting on a fax from the Dallas office," which was untrue. The record suggests the statement about the fax came after Farley was advised of his Miranda rights and had waived them. Regardless of their timing, both of those misstatements are too inconsequential to have affected the knowing and voluntary nature of Farley's waiver.

65

While the Fifth Amendment's privilege against self-incrimination is fully applicable during a custodial interrogation, a suspect may waive his right to remain silent after being properly advised of it, provided he does so "voluntarily, knowingly and intelligently."  Miranda v. Arizona, 384 U.S. 436, 444, 460–61, 86 S.Ct. 1602, 1612, 1620–21 (1966).  The government has the burden of showing the knowing and intelligent nature of a waiver.  Id. at 475, 86 S.Ct. at 1628.  We look for two things:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141 (1986) (quotation marks and citation omitted).

Farley places great weight on the Supreme Court's remark in Miranda that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." 384 U.S. at 476, 86 S.Ct. at 1629.  In effect, he urges us to take this apparently sweeping language as imposing a per se rule that a waiver obtained by deception is

66

not voluntary. As the Supreme Court has more recently made clear, however, such a reading of that passage wrenches Miranda's language "out of context[,] . . . without due regard to the constitutional privilege the Miranda warnings were designed to protect."[19] Colorado v. Spring, 479 U.S. 564, 575, 107 S.Ct. 851, 858 (1987); see also Soffar v. Cockrell, 300 F.3d 588, 596 (5th Cir. 2002) (en banc) ("Subsequent [Supreme Court] cases interpreting Miranda's language show that trickery or deceit is only prohibited to the extent it deprives the suspect of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." (quotation marks and citation omitted)). In Spring federal agents arrested the defendant on a firearms charge, advised him of his Miranda rights, and convinced him to waive those rights and answer questions, without telling him that they also planned to interrogate him about his involvement

---

[19] The context, in the original Miranda decision, was as follows:

> Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege. Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.

384 U.S. at 476, 86 S.Ct. at 1629.

67

in an unrelated murder. Spring, 479 U.S. at 566–67, 107 S.Ct. at 853–54. Quoting

from Miranda the same passage that Farley relies on, Spring argued that his

admissions about the murder should be suppressed because the agents had

"tricked" him into waiving his rights. Id. at 575, 107 S.Ct. at 858.

The Supreme Court rejected that argument, noting that "one who is told he is

free to refuse to answer questions is in a curious posture to later complain that his

answers were compelled." Id. at 576, 107 S.Ct. at 859 (quotation marks and

citation omitted). "[A] valid waiver does not require that an individual be

informed of all information 'useful' in making his decision or all information that

'might . . . affec[t] his decision to confess.'" Id. (alterations in original) (quoting

Moran, 475 U.S. at 422, 106 S.Ct. at 1141)). The Court explained: "[W]e have

never read the Constitution to require that the police supply a suspect with a flow

of information to help him calibrate his self-interest in deciding whether to speak

or stand by his rights." Id. at 576–77, 107 S.Ct. at 859 (alterations in original)

(quoting Moran, 475 U.S. at 422, 106 S. Ct. at 1141). The agents' failure to inform

Spring of the subject of their questioning may have affected the "wisdom" of his

decision to waive his rights, but it did not change the "essentially voluntary and

knowing nature" of that decision. Id. at 577, 107 S.Ct. at 859. The failure to

disclose important information to Spring did not influence his decision in a

"constitutionally significant" manner, because it did not cause him to "misunderstand the nature" of the right he waived. Id. at 576–77, 107 S.Ct. at 858–59. Miranda requires the police to inform a suspect, without qualification, that "anything he says may be used against him." Id. at 577, 107 S.Ct. at 859. This "broad and explicit" warning "conveys to a suspect the nature of his constitutional privilege and the consequences of abandoning it." Id. Accordingly, the Court held, "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." Id.

We cannot simply point to Spring's holding as settling the matter, because the Court's opinion limited its reach to cases involving "mere silence" by law enforcement officials, and specifically declined to decide whether an "affirmative misrepresentation" as to the scope of the interrogation would invalidate a Miranda waiver. Id. at 576 & n.8, 107 S.Ct. at 858 & n.8. Nevertheless, Spring's analysis is compelling, and its distinction between "constitutionally significant" information about the nature of the right being waived, and information that merely affects the "wisdom" of the decision to waive, makes sense regardless of whether there is a

failure to convey information or a communication of misinformation. See id. at 576–77, 107 S.Ct. at 858–59.

In Moran the Supreme Court held a waiver was valid because the defendant's "decision to speak was made with full awareness and comprehension of all the information Miranda requires the police to convey." 475 U.S. at 424, 106 S.Ct. at 1142 (upholding validity of waiver even though police failed to tell defendant his lawyer had called the station trying to reach him, and falsely told lawyer his client was not being interrogated). The same is true here. The "Advice of Rights" form, which Farley both read for himself and had read out loud to him before he initialed and signed it, conveyed in clear language each of the warnings required by Miranda. See Miranda, 384 U.S. at 444–45, 86 S.Ct. at 1612. Knowledge of what the agents really suspected him of doing would no doubt have been useful, possibly even decisive, to Farley in calculating the wisdom of answering their questions. But their deception on that point was not "constitutionally significant," because the lack of that information did not prevent Farley from understanding the nature of his rights and the legal consequences of waiving them. See Spring, 479 U.S. at 576–77, 107 S.Ct. at 858–59.

Even if, contrary to what Spring holds, a suspect's awareness of all the subjects of the investigation were relevant to the voluntariness of his decision to

70

waive <u>Miranda</u> rights, it would be only part of an analysis of "the totality of circumstances surrounding the interrogation." <u>See</u> <u>Moran</u>, 475 U.S. at 421, 106 S.Ct. at 1141 (quotation marks and citation omitted). Although we have not previously considered the exact circumstances in this case—an affirmative misrepresentation about the subject matter of the investigation—case law on police deception generally is instructive. Our circuit law rejects a <u>per se</u> rule that statements obtained by police deception must be suppressed. <u>See</u> <u>United States v. Castaneda-Castaneda</u>, 729 F.2d 1360, 1363 (11th Cir. 1984) ("[T]he police's use of a trick alone will not render a confession involuntary."). Unlike physical violence or the threat of it, which makes any resulting statement <u>per se</u> involuntary, the effect of psychological pressure or deception on the voluntariness of a statement depends on the particular circumstances in each case. <u>Martin v. Wainwright</u>, 770 F.2d 918, 925–26 (11th Cir. 1985), <u>modified on other grounds</u>, 781 F.2d 185 (11th Cir. 1986).

Generally, courts have held statements involuntary because of police trickery only when other aggravating circumstances were also present. <u>Castaneda-Castaneda</u>, 729 F.2d at 1363. Misleading a suspect about the existence or strength of evidence against him does not by itself make a statement involuntary. <u>See, e.g.</u>, <u>Frazier v. Cupp</u>, 394 U.S. 731, 737–39, 89 S.Ct. 1420, 1424–25 (1969)

71

(investigators falsely told defendant that a co-defendant had already confessed); Martin, 770 F.2d at 925 (same); Castaneda-Castaneda, 729 F.2d at 1362–63 (same).  By contrast, statements have been held involuntary where the deception took the form of a coercive threat, see, e.g., Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 920 (1963) (police falsely told defendant that the state would cut off welfare benefits and take her children away if she did not "cooperate"); Spano v. New York, 360 U.S. 315, 323, 79 S.Ct. 1202, 1207 (1959) (police falsely told defendant that his close friend, who was a police officer, would lose his job if defendant did not make a statement); or where the deception goes directly to the nature of the suspect's rights and the consequences of waiving them, see, e.g., Hart v. Attorney Gen. of the State of Fla., 323 F.3d 884, 894–95 (11th Cir. 2003) (detective contradicted Miranda warnings by telling suspect that having a lawyer present would be a "disadvantage" and that "honesty wouldn't hurt him"); United States v. Beale, 921 F.2d 1412, 1435 (11th Cir. 1991) (agents told illiterate defendant that signing waiver form "would not hurt him").

This Court's Hart decision is worth further discussion because Farley relies heavily on it.  There were several police deceptions in Hart, but not all of them were "constitutionally significant" to the majority's conclusion that the defendant's statement was involuntary.  The first "trick" came when Hart was initially brought

in for questioning, and police obtained a <u>Miranda</u> waiver after telling him they wanted to question him about a credit-card theft when in fact they suspected him in a murder. 323 F.3d at 887–88. That deception, which is the one most similar to the one in this case, is mentioned only briefly in the <u>Hart</u> opinion's recitation of the facts and not at all in its legal discussion. Apparently, the <u>Hart</u> Court did not consider the deception important to the voluntariness analysis. Later, a second detective (whom Hart knew from his neighborhood and thought of as a "friend") took over the questioning. <u>Id.</u> at 888. She promised Hart that she "would not lie to him," then proceeded to lie to him, telling him that a security camera had captured on video his commission of the crime, when in fact there was no camera and no video. <u>Id.</u> Although the panel did say that it took Hart's "trust" of the second interrogator as part of the "totality of the circumstances" that made his waiver and confession involuntary, <u>id.</u> at 895, it is not clear how significant the lie about the video evidence was in the analysis.

What this Court did consider significant in <u>Hart</u> was what happened next. Hart asked the detective about the "pros and cons" of hiring a lawyer, which indicated that he "did not fully understand" his rights and was asking for clarification of them. <u>Id.</u> at 894. In response, the detective told him that the "disadvantage" of having a lawyer was that the lawyer would tell him not to

73

answer incriminating questions. Id. That statement was misleading because the whole point of having a lawyer present during an interrogation is to protect the suspect's privilege against self-incrimination. Id. The detective also told Hart that "honesty wouldn't hurt him." Id. That was misleading because it simply was not true—honesty can doom a guilty man—and it contradicted the warning required by Miranda that anything a suspect says can be used against him in court. Id. As a result of the detective's deception, which went to the heart of the Miranda warnings themselves, we concluded that Hart "did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it," meaning that his waiver was not voluntary. Id. at 895.

Nothing like that happened here. Even if the agents did trick Farley into thinking the investigation was about terrorism, there is no evidence they made any promise that questioning would be limited to that subject, or gave him any assurance that statements relating to other crimes would not be used against him.[20] To the contrary, the agents warned Farley, as required by Miranda, that "anything" he said could be used against him in court. See Spring, 479 U.S. at 577, 107 S.Ct. at 859 ("There is no qualification of this broad and explicit warning."). Not just some things, but anything. There is nothing to indicate that Farley was unsure of

_____

[20] The "Advice of Rights" Farley signed was a standard form, and said nothing about the particular subject of questioning.

74

his rights or needed them clarified. He was not deceived about "the nature of his rights and the consequences of abandoning them." Moran, 475 U.S. at 423–24, 106 S.Ct. at 1142. That distinguishes his case from Hart. See 323 F.3d at 894–95.

Even if some police tricks may be "objectionable as a matter of ethics," they are not relevant to the constitutional validity of a waiver unless they interfere with the defendant's "ability to understand the nature of his rights and the consequences of abandoning them." See Moran, 475 U.S. at 423–24, 106 S.Ct. at 1142; cf. Martin, 770 F.2d at 925 (though some of the interrogation tactics were "distasteful," on balance they did not make defendant's confession involuntary). It does not matter if the agents deliberately lied to Farley about the subject of the investigation in order to trick him into signing a waiver they thought he might not otherwise have signed. Their subjective motives for the deception are not relevant. See Moran, 475 U.S. at 423, 106 S.Ct. at 1142 (considering it "irrelevant" to voluntariness analysis whether misleading statement by police was intentional or inadvertent). Because the issue is whether Farley's decision to waive his rights was knowing and voluntary under the totality of the circumstances, the only relevant state of mind is that of Farley himself. See id.

Of course, it defies common sense to posit that Farley was actually "deceived" by Agent Paganucci's remark about terrorism. Farley's argument

75

would have us believe he actually thought that by incredible coincidence the FBI had mistakenly identified him as a terrorist on the same day he just happened to be committing a serious crime that had nothing to do with terrorism. Given the number of times Farley had worried out loud about walking into a sting operation and being met with "cops and TV cameras," he had to know what was up from the moment the agents detained him.

Even if we assume for the sake of discussion that Farley really thought the agents were investigating terrorism and nothing else when he waived his rights, his argument requires more to succeed. It also requires us to assume that if Farley had known that the agents suspected him of the crime he actually did commit, he would have kept his mouth shut. That assumption is belied by what actually happened. Once the direction of the agents' questioning made it clear that they suspected Farley of planning to have sex with a child, any effect the "terrorism" deception had must have ended. Farley had to know when the agents started questioning him about coming to Georgia to have sex with a minor that they were investigating whether he had come to Georgia to have sex with a minor. Among the warnings Farley acknowledged reading and understanding was that he had "the right to stop answering <u>at any time</u>" (emphasis added). At the point in the interview when Farley was questioned about the crime he actually had committed, he was aware of

what he was being questioned about and knew that he was free to stop answering the questions. He chose to continue talking.

We agree with the magistrate judge and with the district court that it makes no difference whether the "terrorism" deception occurred before or after Farley waived his rights (a fact that is not clear from the record). Given that the rights to remain silent and to consult with an attorney do not end when a <u>Miranda</u> waiver is signed, there is no reason why it should matter if the deception about the scope of the investigation comes before or after the waiver is signed. Either way, it is the resulting statement that the defendant is seeking to suppress. In <u>Hart</u> the Court rejected a distinction between the "waiver process" and the "interrogation process," because the proper inquiry is the totality of circumstances surrounding the whole interrogation, not just the circumstances before the waiver form was signed. <u>Hart</u>, 323 F.3d at 893 n.18. There is no dispute that everything Farley said to the agents that was used against him came after he was advised of his rights and had waived them. The timing of the deception does not matter because Farley was told both orally and in writing on the waiver form that even after he started answering questions, he could stop "at any time."

Looking at the totality of the circumstances, nothing indicates that Farley's waiver of his rights was anything less than knowing and voluntary. The agents

never yelled at him or drew their weapons. The questioning lasted only about an hour and a half, and Farley was allowed to go to the bathroom when he asked. Farley was a mature adult, at least in a chronological sense, and no one has ever suggested that his intelligence was below average. See Frazier, 394 U.S. at 739, 89 S.Ct. at 1425 (interrogator's lie that accomplice had already confessed, while "relevant," was insufficient to make defendant's otherwise voluntary confession inadmissible where "questioning was of short duration, and petitioner was a mature individual of normal intelligence"). It is instructive to contrast the circumstances here with those in Martin, where we held the defendant's confession voluntary even though it came after a five-hour interrogation in which one detective "raised his voice at Martin, cursed him, and discussed the death penalty," lied to him by stating that a co-defendant had confessed, ignored his request to suspend questioning until the next day, and falsely assured him that the truth "couldn't hurt him." 770 F.2d at 925. Farley's interview was tame by comparison. His waiver of his Miranda rights was knowing and voluntary, and the district court did not err in admitting his post-arrest statements.[21]

---

[21] Because we conclude there was no error, we need not decide whether admission of the statements would have been harmless error. Aside from Farley's admission that he did plan to meet Stephanie and her daughter at the IHOP restaurant—which was followed immediately by a denial that he had any intention of having sex with the child—the statements gave the government little it did not already have. The district court did not refer to them at all in its findings of fact on Farley's guilt.

## 2.

Farley contends that the district court erred in failing to suppress the child pornography and other evidence found on the laptop computer that he had with him on the airplane. Although Farley consented to the search of the computer, and signed a form acknowledging he did so voluntarily after being advised of his right to refuse,[22] he argues that Agent Paganucci's "trickery" about the subject matter of the investigation rendered his consent involuntary. As with a <u>Miranda</u> waiver, the voluntariness of a consent to search depends on the totality of the circumstances. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48 (1973).

Whatever impact Agent Paganucci's "terrorist" remark may have had on Farley's earlier decision to waive his <u>Miranda</u> rights, it could have had no effect on his consent to the search of his laptop computer. Paganucci's uncontested testimony was that Farley gave that consent toward the end of the interview, and by that time he was well aware of the true subject of the investigation. Farley's alternative argument, that his consent was not voluntary because it was given in acquiescence to a show of lawful authority in a "matter of national security," fails for the same reason. Farley knew perfectly well by the time that he gave his

---

[22] Farley also signed identical "consent to search" forms for his cell phone, Blackberry handheld device, and Yahoo! account, but he does not mention them in his briefs to us. The failure to do so probably stems from the fact that those three searches produced nothing significant. They did confirm that Farley had been the author of the communications with "Stephanie," but he conceded that at trial.

79

consent to the search that the agents did not suspect him of being a terrorist. He knew when he consented to the search that the agents were looking for child pornography on the laptop because they had specifically asked him whether he had used it to search for child pornography. Given all of the circumstances, Farley's consent to the search was knowing and voluntary. The district court did not err in denying his motion to suppress the evidence found on the laptop.

3.

Farley contends that the printed Mapquest directions should have been excluded from evidence because the warrantless search of his briefcase, to which he did not consent, was improper.[23] He also argues that because the agents would not have known he even had a computer with him if they had not seen it inside the briefcase, everything found on the computer should have been excluded as fruit of the poisonous tree.

Farley's rationale for challenging the briefcase search has not been consistent. At a pretrial conference before the district court, his counsel argued that the search was invalid because Farley had not been formally arrested. Counsel based that argument on Agent Paganucci's admission that he could not remember whether he had specifically informed Farley that he was "under arrest" when the

---

[23] Farley also objected to the search of his suitcase on the same basis, but that issue is moot because nothing of significance was found in it.

agents told him that he needed to come with them, handcuffed him, led him off the plane, put him into the back seat of a police car, drove him to a police station, searched him and removed his wallet, cuffed him to a chair, and read him his rights. However, counsel conceded to the court that if Farley was "under arrest," then "there's inventory policies that allow for the search of items." The district court found that Farley had been arrested when the agents detained him on the plane, and it denied Farley's motion to suppress the contents of the briefcase.

Farley does not address the district court's determination that he was legally arrested, so he has abandoned any argument that he was not.[24] See United States v. Ardley, 242 F.3d 989, 990 (11th Cir. 2001). Instead, he argues that the search was not a proper inventory search because the agents should have sealed the briefcase in his presence rather than opening it to itemize its contents. This argument has no merit. Inventory searches of an arrestee's personal property are a "well-defined exception" to the Fourth Amendment's warrant requirement. Colorado v. Bertine, 479 U.S. 367, 371, 107 S.Ct. 738, 741 (1987).[25] When police take custody of a

---

[24] In any event, whether an arrest has occurred depends on the particular facts of the detention, and there is no requirement that a detainee be told in "formal words" that he is under arrest. United States v. Ashcroft, 607 F.2d 1167, 1170 (5th Cir. 1979). No one disputes that Farley was not free to leave throughout the relevant time.

[25] It is not clear from the district court's ruling whether it denied the motion to suppress the result of the briefcase search on the ground that it was an inventory search or a search incident to arrest, and the government argues both grounds on appeal. We will affirm a district court's evidentiary ruling if it was correct on any ground. United States v. Cardenas, 895 F.2d 1338, 1345 (11th Cir. 1990). Because the inventory search ground is dispositive, we need not

81

bag, suitcase, box, or any similar container, they may open it in order to itemize its contents pursuant to standard inventory procedures. United States v. Laing, 708 F.2d 1568, 1570–71 (11th Cir. 1983). That is what the agents did in this case. When they opened Farley's briefcase and suitcase they compiled an inventory, itemizing the complete contents of both bags on a standard "Receipt for Property" form. The sole authority Farley cites to support his position, United States v. Davis, 501 F. Supp. 23, 26 (N.D. Ga. 1980), is a district court decision whose reasoning this Court has specifically rejected. See Laing, 708 F.2d at 1571 n.5. The search of the briefcase was proper, and the district court did not err in admitting the printed Mapquest directions or in rejecting Farley's "fruit of the poisonous tree" argument with respect to the computer.

**D.**

Farley also contends that the evidence was insufficient to support his conviction on either count. We review de novo whether sufficient evidence supports a conviction, resolving all reasonable inferences in favor of the verdict. United States v. Brown, 415 F.3d 1257, 1270 (11th Cir. 2005). In reviewing evidentiary sufficiency, "we must determine whether the evidence, construed in the light most favorable to the government, would permit the trier of fact to find the

---

address the search incident to arrest ground.

82

defendant guilty beyond a reasonable doubt." Id. (quotation marks and citation omitted). We will not reverse unless no reasonable trier of fact could find guilt beyond a reasonable doubt. United States v. Schaltenbrand, 930 F.2d 1554, 1560 (11th Cir. 1991). "It is not our function to make credibility choices or to pass upon the weight of the evidence." Brown, 415 F.3d at 1270 (quotation marks and citation omitted). "Instead, we must sustain the verdict where there is a reasonable basis in the record for it." Id. (quotation marks and citation omitted). That is no less true when the district court, instead of a jury, acts as the trier of fact. Hearn v. McKay, 603 F.3d 897, 904 (11th Cir. 2010) ("It is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony." (alteration and quotation marks omitted)).

To convict Farley under § 2422(b) for attempting to entice a minor for sexual activity, the government needed to prove (1) that Farley acted with the kind of culpability required for the crime he was charged with attempting, and (2) that he engaged in conduct constituting a substantial step toward its commission. Root, 296 F.3d at 1227–28. Farley did not contest that the government had proved the substantial step element, but contended only that it had not proven he acted with the necessary intent. We agree with the district court's well-reasoned rejection of that contention.

83

Farley's communications with "Stephanie" are ample proof of his criminal intent to entice a person he believed to be a ten- or eleven-year-old girl into sexual activity. Farley asks us to find that evidence insufficient because, during his chats with "Stephanie," he sometimes talked about things other than sex with children. That is like an English teacher arguing that he should not be convicted for attempting to sexually molest a student if some of their time together, when he was not propositioning her, was spent discussing participles.

What Farley did say to Stephanie on the subject of sex with her daughter is more than enough to show his criminal intent. He spent months instructing a mother to show her prepubescent daughter pornographic videos, teach her to masturbate, and touch her sexually, all in preparation for his own violation of the child. Farley admitted at trial that he could not be "certain" Stephanie was not actually carrying out his instructions on an actual child. In his chat messages and emails he described in sickening detail what he intended to do to the little girl when he got there; and he repeatedly acknowledged his awareness that what he planned to do was highly illegal. Cf. Root, 296 F.3d at 1228 (criminal intent established by defendant's instant messages to purported thirteen-year-old describing sex acts he wanted to perform with her, and by his acknowledgment he could "get in a lot of trouble" because she was so young). The district court's

decision, as the trier of fact, to believe Farley's repeated professions in those communications that he was "for real," and to disbelieve his insistence at trial that it was all a fantasy, was entirely reasonable. Cf. Yost, 479 F.3d at 819 ("Nothing in the [chat] transcripts supports Yost's claim he believed he was communicating with adult women role-playing as minors.").

The same evidence also shows that Farley took substantial steps toward the completion of the crime. His trip to Atlanta to meet the mother and child was not the only step he took. See Root, 296 F.3d at 1228 (defendant's five-hour drive to agreed meeting place was substantial step). For example, each of Farley's instructions to Stephanie to "groom" her daughter for sexual contact with him were not just statements of his intent, but "actual, objective acts that . . . strongly corroborate[]" his culpability. See id. (defendant's requests for the "child" to perform sex acts constituted substantial steps); see also Yost, 479 F.3d at 819–20 (defendant's sending of sexually explicit messages and picture of his penis to purported underage girl, and his arrangement to meet her, were objective acts "strongly corroborat[ing]" culpability). The district court's verdict that Farley attempted to entice a minor into sexual activity is fully supported by the evidence.

Convincing evidence also supports Farley's conviction under § 2241(c). Under that statute, the crime is crossing a state line with the requisite criminal

85

intent. Conviction "turns simply on the illegal purpose for which [Farley] traveled." Root, 296 F.3d at 1231–32 (discussing evidence sufficiency for interstate travel conviction under 18 U.S.C. § 2423(b)). The district court understandably had "very little trouble finding beyond a reasonable doubt" that Farley believed there was an actual child, and it reasonably concluded that Farley's communications with Stephanie were a more truthful expression of his intentions toward that child than his trial testimony. The court, after all, saw Farley testify and had an opportunity to determine his credibility or lack thereof. See Hearn, 603 F.3d at 904.

The district court found beyond a reasonable doubt that Farley's intention in traveling to Atlanta was to meet Stephanie and Sydney and then to sexually assault the child. The printout of the Mapquest directions to the IHOP restaurant, which Farley brought to Atlanta, is strong evidence of that intent. The court as factfinder was entitled to take Farley's implausible explanation for how those directions ended up in his briefcase as substantive evidence of his guilt, and it did. See United States v. Williams, 390 F.3d 1319, 1325 (11th Cir. 2004); cf. United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) (defendant who chooses to testify runs risk that, if disbelieved, factfinder will conclude the opposite is true). Also proving Farley's intent were his efforts to ensure that Stephanie and Sydney were "for real"

by asking them to pose in a picture holding a sign with his name on it. He had no reason to do that if, as he claimed, he was just "role playing" and was not interested in being with them in person. Not only that, but as the district court observed, if Farley did not intend to show up for their meeting then there was no reason for him to tell Stephanie he was coming to Atlanta in the first place.

Evidence that Farley had a legitimate business purpose for his trip to Atlanta, and that Strategic Staffing Services paid his expenses, does not undermine the court's conclusion about Farley's intent. The court reasonably could have inferred that Farley arranged the business meeting in order to give himself an opportunity to fly to Atlanta and molest a child on someone else's dime, or to give himself a cover story in case his fears of a police sting came true, or that he simply took advantage of the trip for that purpose.[26] At best for Farley, the evidence establishes only that he also intended to close an insurance deal the morning after he had sexually violated an eleven-year-old girl with her mother's help.

Farley also argues as exculpatory evidence the fact that he lied to Stephanie about the timing of his flight, telling her he would arrive around 6:30 p.m. when his plane was actually scheduled to land two hours earlier. He insists that this proves he did not really intend to show up for the meeting at the IHOP, and instead

---

[26] At the suppression hearing, Detective Southerland testified that Chris Polk told her the Atlanta business meeting had been Farley's idea. However, this evidence was not presented at trial.

87

planned to use Sydney's 8:30 p.m. bedtime as an excuse to cancel at the last minute. However, an equally reasonable inference from that evidence is that Farley wanted to arrive early so that he could scout out the meeting location and make sure there were no police waiting for him.

Even if Farley had a plausible innocent explanation for his conduct, we would be required to affirm his conviction so long as there was evidence sufficient for a reasonable factfinder to find guilt beyond a reasonable doubt, after we drew all inferences in favor of the verdict. See Brown, 415 F.3d at 1270–71; United States v. Jordan, 582 F.3d 1239, 1247 (11th Cir. 2009) ("The evidence does not need to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." (quotation marks omitted)). In any event, Farley's attempts to explain away the mountain of evidence against him are not plausible. They are, to quote Jeremy Bentham, "nonsense upon stilts." See Anarchical Fallacies; Being an Examination of the Declarations of Rights Issued During the French Revolution (1795), reprinted in 2 The Works of Jeremy Bentham 501 (John Bowring ed.,

William Tait 1843). The evidence was more than enough to establish Farley's

guilt beyond a reasonable doubt on both counts.[27]

We turn now to the government's appeal of the district court's ruling that the

thirty-year mandatory minimum sentence under § 2241(c) is constitutionally

disproportionate.

**IV.**

As Chief Justice Roberts recently put it, the Supreme Court "has struggled

with whether and how to apply the Cruel and Unusual Punishments Clause to

sentences for noncapital crimes," and has "not established a clear or consistent path

for courts to follow in applying the highly deferential narrow proportionality

analysis." Graham v. Florida, No. 08–7412, ___ U.S. ___, 2010 WL 1946731, at

*25 (May 17, 2010) (Roberts, C.J., concurring in the judgment) (quotation marks

omitted); see also Lockyer v. Andrade, 538 U.S. 63, 72, 123 S.Ct. 1166, 1173

---

[27] The final issue Farley raises in his cross-appeal challenges the district court's application of a two-level sentence enhancement for obstruction of justice based on its conclusion that Farley gave false testimony at trial. See U.S.S.G. § 3C1.1. In light of our decision on the constitutionality of the thirty-year minimum sentence under § 2241(c), discussed in the next section, this issue probably is moot. With or without the two-level enhancement, Farley's guidelines calculations would have produced a sentencing range well below the thirty-year minimum mandated by the statute. When that happens, the mandatory minimum becomes the guidelines sentence. See U.S.S.G. § 5G1.1(b). In any event, we would not have agreed with Farley's argument about this enhancement. The record, to say nothing of the conviction itself, fully supports the district court's finding that Farley gave false testimony when he took the stand and denied any intention of having sex with a child. More particularized sentence findings were not required. See United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002). If it mattered, the enhancement is applicable.

(2003) (noting that "our precedents in this area have not been a model of clarity" and "we have not established a clear or consistent path for courts to follow"); Harmelin v. Michigan, 501 U.S. 957, 996, 111 S.Ct. 2680, 2702 (1991) (plurality opinion of Kennedy, J., joined by O'Connor & Souter, JJ.) (stating that "our proportionality decisions have not been clear or consistent in all respects"). The path the Court has established is clear enough, however, for us to decide that the thirty-year mandatory minimum sentence imposed on Farley is not constitutionally disproportionate.

### A.

The decisional law about how the Eighth Amendment's Cruel and Unusual Punishments Clause applies to non-capital sentences imposed on adults is primarily contained in a half dozen or so Supreme Court decisions issued in a period spanning nearly a century. The first one, Weems v. United States, 217 U.S. 349, 30 S.Ct. 544 (1910), recognized that the Eighth Amendment prohibits punishments that are grossly disproportionate to the crime. Beyond that, Weems has little application in modern times because it involved the outdated and physically painful punishment of cadena temporal, which was to be imposed for a period of fifteen years on a man for falsifying a public record. Id. at 358, 30 S.Ct.

at 545.[28]  Farley did not commit an offense involving paperwork and he is not being subject to cadena temporal punishment.

The next decision, Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133 (1980), upheld the constitutionality of a mandatory life sentence with the possibility of parole after twelve years.[29]  That sentence had been imposed under a recidivist statute for the defendant's third white collar felony, a $120.75 false pretenses offense, and his two earlier felonies had involved the theft of a total of $108.36. Id. at 265, 100 S.Ct. at 1135.  In rejecting the constitutional attack on that sentence, the Court held that the absence of violence in the crimes being punished was not determinative of the disproportionality issue because "the presence or absence of violence does not always affect the strength of society's interest in deterring a particular crime or in punishing a particular criminal."  Id. at 275, 100 S.Ct. at 1140.  The Court also said that those who unsuccessfully attempt to commit crimes are "no less blameworthy, only less skillful" than those who succeed.  Id. at 276, 100 S.Ct. at 1140.

---

[28] "[I]t is provided that those sentenced to cadena temporal and cadena perpetua shall labor for the benefit of the state.  They shall always carry a chain at the ankle, hanging from the wrists; they shall be employed at hard and painful labor, and shall receive no assistance whatsoever from without the institution."  Weems, 217 U.S. at 364, 30 S.Ct. at 548 (quotation marks omitted).

[29] In the Rummel opinion itself the Court said that Rummel would probably be eligible for parole in twelve years, but in Solem v. Helm, 463 U.S. 277, 301–02, 103 S.Ct. 3001, 3016 (1983), the Court clarified that Rummel could have been eligible for parole in as few as 10 years, although "in the normal course of events" it would be 12 years.

Next came Hutto v. Davis, 454 U.S. 370, 102 S.Ct. 703 (1982), summarily reversing a court of appeals decision that a forty-year sentence was so grossly disproportionate to the crime of possessing and distributing less than nine ounces of marijuana (said to have a street value of about $200) that it violated the Eighth Amendment's Cruel and Unusual Punishments Clause. The Court scolded the court of appeals for failing to heed the Rummel decision, reiterated that courts should be reluctant to review legislatively mandated terms of imprisonment, and stressed that successful disproportionality challenges should be "exceedingly rare." Id. at 372, 374, 102 S.Ct. at 704–05. The Court criticized the court of appeals for sanctioning "an intrusion into the basic line-drawing process that is properly within the province of the legislatures, not courts." Id. at 374, 111 S.Ct. at 706 (quotation marks omitted).

Aside from Weems, which involved an archaic punishment, the only case in which the Supreme Court has held that a non-capital sentence imposed on an adult was constitutionally disproportionate is Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001 (1983). That case involved a defendant sentenced to life imprisonment without parole for "uttering a 'no account' check for $100," id. at 281, 103 S.Ct. at 3005, the latest in a string of relatively minor offenses. Helm's earlier crimes, like that offense, "were all nonviolent, none was a crime against a person, and alcohol

was a contributing factor in each case." Id. at 280, 103 S.Ct. at 3005. The Supreme Court held that "a criminal sentence must be proportionate to the crime for which the defendant has been convicted," id. at 290, 103 S.Ct. at 3009, and that the proportionality inquiry should be guided by objective factors, such as the gravity of the offense and the severity of the punishment, id. at 290–92, 103 S.Ct. at 3010–11. The Court also said that "it may be helpful" to compare sentences imposed on other criminals in the same jurisdiction and that courts "may find it useful" to compare sentences imposed for the same crime in other jurisdictions. Id. at 291–92, 103 S.Ct. at 3010–11. In discussing how to measure the harm "caused or threatened to the victim or society," the Court noted the difference between nonviolent and violent crimes and between attempts and completed crimes. Id. at 292–93, 103 S.Ct. at 3011. In weighing the culpability of the criminal, the Court laid out what it described as "clear distinctions that courts may recognize and apply," including the difference between negligent and intentional conduct and differences in motive (the example given was that a contractual murder is "more serious" than a non-contractual one). Id. at 293–94, 103 S.Ct. at 3011. As for the severity of sentences of imprisonment, the Court said that "the problem is not so much one of ordering, but one of line-drawing," and conceded that such decisions "although troubling, are not unique to this area." Id. at 294, 103 S.Ct. at 3012.

Turning to the case before it, the Solem Court viewed the crime of uttering a "no account" check for $100 as "one of the most passive felonies a person could commit," pointing out that it "involved neither violence nor threat of violence to any person" and "is viewed by society as among the less serious offenses." Id. at 296, 103 S.Ct. at 3012–13 (quotation marks omitted). Nor did the Court think that the case was a compelling one for application of habitual offender penalties: "His prior offenses, although classified as felonies, were all relatively minor. All were nonviolent and none was a crime against a person." Id. at 296–97, 103 S.Ct. at 3013 (footnote omitted). Because Helm's record "involves no instance of violence of any kind," the Court thought that "[i]ncarcerating him for life without possibility of parole is unlikely to advance the goals of our criminal justice system in any substantial way." Id. at 297 n.22, 103 S.Ct. at 3013 n.22.

As for the severity of Helm's punishment, the Court recognized that life without the possibility of parole was "far more severe" than the life sentence with parole eligibility in twelve years that had been imposed in Rummel. Id. at 297, 103 S.Ct. at 3013. It was the most severe sentence that could be imposed in the state where Helm was sentenced, which did not have capital punishment. Id. The Court then surveyed the penalties available in that state and found "a large group of very serious offenses for which life imprisonment was not authorized, including a third

94

offense of heroin dealing or aggravated assault," and that "Helm [had] been treated in the same manner as, or more severely than, criminals who have committed far more serious crimes." Id. at 298–99, 103 S.Ct. at 3013–14. Looking to other jurisdictions, the Court determined that "Helm was treated more severely than he would have been in any other State" with one possible exception. Id. at 299–300, 103 S.Ct. at 3014–15. For these reasons, the Court concluded that Helm's sentence was "significantly disproportionate to his crime, and [was] therefore prohibited by the Eighth Amendment." Id. at 303, 103 S.Ct. at 3016–17.

Farley, unlike Helm, is not facing a life without parole sentence. And he was not convicted for "one of the most passive felonies a person could commit," or one that "is viewed by society as among the less serious offenses." Id. at 296, 103 S.Ct. at 3012–13 (quotation marks omitted). Far from it. Still, if Solem were the last word on the subject, it would be of some use to Farley. Its usefulness to him would not lie in Solem's actual holding—the result considered in light of the facts of the case—because the facts of the two cases are materially different. Attempts to sexually molest children are at the opposite end of the severity and harm spectrum from writing a bad check. The usefulness of Solem to Farley would be in the opinion's relatively aggressive approach to disproportionality review and in some of the objective factors it specified that courts may apply in deciding whether

95

a particular sentence is constitutionally disproportionate.  <u>Solem</u> is not, however, the last word from the Supreme Court on this subject.

Eight years after <u>Solem</u> the Supreme Court decided in <u>Harmelin v. Michigan</u>, 501 U.S. 957, 111 S.Ct. 2680 (1991), that a mandatory sentence of life imprisonment without the possibility of parole was not constitutionally disproportionate for the crime of possession of 672 grams (23.7 ounces or 1.48 pounds) of cocaine, even for a first offender.  The <u>Harmelin</u> decision dooms Farley's contention that the mandatory minimum sentence of thirty years imposed on him is unconstitutional.

As for the mandatory nature of the penalty, the <u>Harmelin</u> Court scoffed at the idea that depriving the sentencer of discretion to consider mitigating circumstances could make any difference in whether a non-capital sentence was constitutionally disproportionate.  <u>See</u> <u>id.</u> at 994–95, 111 S.Ct. at 2701.  The Court reasoned that:  "Severe, mandatory penalties may be cruel but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history. . . .  There can be no serious contention, then, that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory.'"  <u>Id.</u>  Applied to the present case, that means a thirty-year sentence mandatorily imposed for violation of § 2241(c) is to be viewed the same as if it

96

were a thirty-year sentence chosen by a judge in the exercise of her sentencing discretion.

Because it is the narrowest basis for the result in <u>Harmelin</u>, Justice Kennedy's concurring opinion, which was joined by two other Justices, <u>see id.</u> at 996, 111 S.Ct. at 2702 (plurality opinion of Kennedy, J., joined by O'Connor & Souter, JJ.), contains most of the Court's holdings in that case. <u>See</u> <u>Marks v. United States</u>, 430 U.S. 188, 193, 97 S.Ct. 990, 994 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds." (quotation marks omitted)).[30] In keeping with the <u>Marks</u> instructions about fragmented opinions, we will hereafter treat Justice Kennedy's plurality opinion as that of the Court and his statements as coming from the Court, but we will still observe the niceties of citation form. <u>See also</u> <u>Graham v. Florida</u>, No. 08–7412,

---

[30] Justice Kennedy's concurring opinion in <u>Harmelin</u> rests on a narrower ground than Justice Scalia's lead opinion, which would have concluded that "the Eighth Amendment contains no proportionality guarantee," 501 U.S. at 965, 111 S.Ct. at 2686 (Scalia, J., joined by Rehnquist, C.J.). <u>See</u> <u>United States v. Robison</u>, 505 F.3d 1208, 1221 (11th Cir. 2007) ("The 'narrowest grounds' is understood as the 'less far-reaching' common ground.").

However, Part IV of Justice Scalia's opinion, which we have cited in the previous paragraph of the text of this opinion, is also the opinion of the Court in <u>Harmelin</u> because it was joined by a majority of the Justices who voted for the judgment in that case. <u>See id.</u> at 996, 111 S.Ct. at 2702 (Kennedy J., joined by O'Connor & Souter, JJ., concurring) ("I concur in Part IV of the Court's opinion and in the judgment.").

97

2010 WL 1946731, at *8 (U.S. May 17, 2010) (stating that Justice Kennedy's opinion in Harmelin was the "controlling opinion" with regard to the proportionality issue); Ewing v. California, 538 U.S. 11, 23–24, 123 S.Ct. 1179, 1187 (2003) (plurality opinion) ("The proportionality principles in our cases distilled in Justice Kennedy's concurrence [in Harmelin] guide our application of the Eighth Amendment in the new context that we are called upon to consider.").[31]

The Harmelin Court recognized "that the Cruel and Unusual Punishments Clause encompasses a narrow proportionality principle" that applies to non-capital sentences. Harmelin, 501 U.S. at 997, 111 S.Ct. at 2702–03 (plurality opinion). Candidly, the Court acknowledged that the proportionality principle's "precise contours are unclear," and "Solem, furthermore, appeared to apply a different analysis than in Rummel and Davis." Id. at 998, 111 S.Ct. at 2703. From "close analysis" of its decisions, however, the Court was able to come up with "some common principles that give content to the uses and limits of proportionality review." Id.

---

[31] Under the Marks rule the plurality opinion in Ewing is the controlling one because it supported the judgment in that case on a narrower ground than did the concurring opinions of Justices Scalia and Thomas. Compare Ewing, 538 U.S. at 14, 123 S.Ct. at 1181 (plurality opinion of O'Connor, J., joined by Rehnquist, C.J., and Kennedy, J.), with id. at 31, 123 S.Ct. at 1190 (Scalia, J., concurring in the judgment), and id. at 32, 123 S.Ct. at 1191 (Thomas, J., concurring in the judgment).

The "first of these principles" is one generally calling for hands off by the judiciary, because "the fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter, is properly within the province of legislatures, not courts." Id. (quotation marks omitted). The responsibility for making the difficult and fundamental choices that go into setting the limits of criminal penalties lies with the legislature, and its choices are "not to be interfered with lightly, nor by any judicial conception of their wisdom or propriety." Id. at 998–99, 111 S.Ct. at 2703–04 (quotation marks omitted). The second principle, which also calls for judicial humility in this area, is that "the Eighth Amendment does not mandate adoption of any one penological theory," and over time there have been varying theories and approaches to criminal sentencing. Id. at 999, 111 S.Ct. at 2704. More specifically, "competing theories of mandatory and discretionary sentencing have been in varying degrees of ascendancy or decline since the beginning of the Republic." Id. The third principle the Harmelin Court saw as limiting proportionality review is that variations in underlying theories and in the length of prescribed prison sentences "are the inevitable, often beneficial, result of the federal structure," which means that one jurisdiction or another will usually treat offenders more severely than most jurisdictions do, id. at 998–1000, 111 S.Ct. at 2703–04.

The fourth principle set out by the <u>Harmelin</u> Court is that proportionality review should be informed by "objective factors to the maximum possible extent." <u>Id.</u> at 1000, 111 S.Ct. at 2704 (quotation marks omitted). The Court said that "[t]he most prominent objective factor is the type of punishment imposed," and one example it gave was the difference between <u>cadena</u> <u>temporal</u> in the <u>Weems</u> case and "more traditional forms of punishment imposed under the Anglo-Saxon system." <u>Id.</u> at 1001, 111 S.Ct. at 2704 (quotation marks omitted). Another example was the difference between capital punishment and imprisonment for a term of years. <u>Id.</u> By contrast, the difference between one term of years and another is not subject to that kind of objective analysis. <u>Id.</u> at 1001, 111 S.Ct. at 2705 ("By contrast, our decisions recognize that we lack clear objective standards to distinguish between sentences for different terms of years."). That, explained the Court, is why "outside the context of capital punishment, <u>successful</u> challenges to the proportionality of particular sentences are exceedingly rare." <u>Id.</u> (quotation and other marks omitted).

The Supreme Court summed up the four principles it set out and the final principle they lead to in this passage from <u>Harmelin</u>:

> All of these principles—the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors—inform the final one: The Eighth Amendment does not

100

require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.

Id. (citation omitted).

The Court then applied those principles to "the challenged aspects of petitioner's sentence: its severe length and its mandatory operation." Id. Acknowledging that a life without parole sentence was the second most severe penalty permitted by law, the Court pointed out that the crime in Harmelin "was far more grave than the crime at issue in Solem." Id. Solem's crime was a passive one involving neither violence nor the threat of violence and was viewed by society as among the less serious offenses. Not only that, but the felonies underlying his status as a recidivist were all relatively minor. Id. at 1002, 111 S.Ct. at 2705. By contrast, Harmelin had been convicted of possession of more than 650 grams of cocaine, a crime that "falls in a different category from the relatively minor, nonviolent crime at issue in Solem." Id. The Court characterized Harmelin's suggestion that his crime was nonviolent and victimless as "false to the point of absurdity." Id. at 1002, 111 S.Ct. at 2705–06. The Court explained that the "[p]ossession, use, and distribution" of illegal drugs threatened grave harm to society not only because of the pernicious effects that those drugs have on those who use them, but also because their sale may lead to other crimes, including

crimes of violence.[32]  Id. at 1002–03, 111 S.Ct. at 2706.  Because of those

pernicious effects, the state legislature "could with reason conclude that the threat

posed to the individual and society by possession of this large an amount of

cocaine—in terms of violence, crime, and social displacement—is momentous

enough to warrant the deterrence and retribution of a life sentence without parole."

Id. at 1003, 111 S.Ct. at 2706.

The Court noted that a life without parole sentence for possession of 672

grams of cocaine fell "within the constitutional boundaries established by our prior

decisions," including the Davis decision that had upheld a forty-year sentence for

possession with intent to sell nine ounces of marijuana.  Id. at 1004, 111 S.Ct. at

2706.  Michigan, as the Court pointed out, could rationally conclude Harmelin's

crime was more serious than Davis' crime.  Id.

---

[32] The Michigan statute under which Harmelin was convicted made the mere possession of 650 or more grams of cocaine punishable by life imprisonment without the possibility of parole, see Mich. Comp. Laws §§ 333.7403(2)(a)(i) (mandatory life sentence) and 791.234(4) (no parole eligibility for "major controlled substance offense"), even without any intent to distribute.  See Harmelin, 501 U.S. at 1024–25, 111 S.Ct. at 2717–18 (White, J., dissenting).  Nevertheless, the sheer quantity of drugs involved, as well as other "trappings of a drug trafficker" (a beeper, plastic bags, a coded address book, and several thousand dollars in cash), see id. at 1008, 111 S.Ct. at 2709 (Kennedy, J., concurring), strongly suggested that Harmelin intended more than just personal use, and the Supreme Court assumed as much in considering the gravity of the social harm caused by the crime.  See id. at 1002–03, 111 S.Ct. at 2705–06 (plurality opinion).  In interpreting the Harmelin decision, we will follow the Supreme Court's lead and assume that Harmelin intended to distribute the pound and a half of cocaine he possessed.

Harmelin argued that a court could not decide whether a sentence was constitutionally disproportionate without comparing it to sentences imposed for other crimes in the same jurisdiction and those imposed for the same crime in other jurisdictions. Id. at 1004, 111 S.Ct. at 2706–07. The Court disagreed, stating that whatever the Solem opinion said, "it did not announce a rigid three-part test," and "comparative analysis within and between jurisdictions is not always relevant to proportionality review." Id. at 1004–05, 111 S.Ct. at 2707. To the contrary, "intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." Id. at 1005, 111 S.Ct. at 2707. Without an initial judgment that a sentence is grossly disproportionate to a crime, comparative analysis of sentences has no role to play. Applying that rule to the Harmelin case, the Supreme Court determined that in light of the seriousness of the offense, the life without parole sentence "[did] not give rise to an inference of gross disproportionality" and there was no need for any comparative analysis. Id.

At this point in the analysis the concurring opinion of Justice Kennedy stopped being the opinion of the Court under Marks but continued as a concurring

opinion on the subject of the mandatory nature of the sentence.[33] Concurring in the result, it rejected the contention that the Constitution requires individualized sentencing and consideration of mitigating circumstances in non-capital cases. Id. at 1006, 111 S.Ct. at 2707 (Kennedy, J., concurring). The power of the legislature to specify punishments without giving the courts any sentencing discretion being "beyond question," illegal drugs being "a most serious contemporary social problem," and "clear notice of the severe consequences" having been given, the mandatory life without parole penalty was constitutionally permissible. Id. at 1006–08, 111 S.Ct. at 2708.[34]

___

[33] Here is why. Justice Kennedy, joined by Justices O'Connor and Souter, specifically concurred in Part IV of Justice Scalia's opinion, id. at 996, 111 S.Ct. at 2702, which had been joined in full by Chief Justice Rehnquist, id. at 961, 111 S.Ct. at 2683. That means five Justices joined Part IV of Justice Scalia's opinion, which addressed the issue of whether the mandatory nature of the sentence rendered it constitutionally disproportionate, making it the opinion of the Court on that issue. See id. at 961, 111 S.Ct. at 2683 ("Justice Scalia announced the judgment of the Court and delivered the opinion of the Court with respect to Part IV . . . .").

The Marks rule does not apply to an issue resolved in any part of an opinion that five Justices have joined, which becomes the opinion of the Court on that issue. The additional discussion of the mandatoriness issue in Justice Kennedy's opinion, joined by only two other Justices, is only a concurring opinion. In any event, that part of Justice Kennedy's opinion is entirely consistent with Part IV of Justice Scalia's opinion, which is the opinion for the Court on that issue.

[34] Only recently the Supreme Court decided in Graham v. Florida that a life without parole sentence is unconstitutionally disproportionate for any non-homicide crime committed by a person under the age of eighteen. The Graham decision did not undermine Harmelin insofar as adult offenders are concerned, but recognized instead that Harmelin is still "suited for considering a gross proportionality challenge to a particular defendant's sentence." Graham v. Florida, No. 08–7412, 2010 WL 1946731, at *9 (U.S. May 17, 2010). Graham has no application to Farley, who was thirty-seven years old when he first initiated contact with Stephanie. See, e.g., id. at *13 ("[B]ecause juveniles have lessened culpability they are less deserving of the most severe punishments."); id. at *28 (Roberts, C.J., concurring in the judgment) ("Graham's age places him in a significantly different category from the defendants in

Twelve years after Harmelin the Supreme Court rejected a disproportionality attack on a sentence of 25 years to life imposed, under California's "Three Strikes and You're Out" law, on a defendant with a long, serious criminal record who stole three golf clubs. Ewing v. California, 538 U.S. 11, 123 S.Ct. 1179 (2003) (plurality opinion). The decision is primarily about recidivism laws, but it did recognize and extend to that context the proportionality principles that had been set out in Harmelin. See id. at 23–24, 123 S.Ct. at 1187.[35] On the same day that Ewing was released, the Court issued another decision in a case arising under California's three strikes law. That case involved a habitual offender who on two occasions two weeks apart stole two videos from a store and was sentenced to two consecutive sentences of twenty-five years to life. Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166 (2003). Applying the AEDPA deference provisions, the Supreme Court held that the state court decision rejecting a disproportionality attack on that sentence was not an unreasonable application of clearly established federal law. Id. at 76–77, 123 S.Ct. at 1175.

**B.**

---

Rummel, Harmelin, and Ewing, all of whom committed their crimes as adults.").

[35] As we have already mentioned, Justice O'Connor's plurality opinion in Ewing is the controlling one. See supra note 31.

The thirty-year mandatory minimum sentence imposed on Farley for violating § 2241(c) cannot be constitutionally disproportionate in light of the principles announced in Harmelin or the actual holding of that decision. Harmelin squarely establishes that the mandatory nature of a non-capital penalty is irrelevant for proportionality purposes. Harmelin, 501 U.S. at 994–95, 111 S.Ct. at 2701 (opinion of the Court); id. at 1006, 111 S.Ct. at 2707–08 (Kennedy, J., concurring). As a result, in deciding whether the thirty-year sentence that § 2241(c) requires for Farley is constitutionally disproportionate we treat that sentence no differently from one that is imposed in the exercise of a judge's sentencing discretion.

Harmelin's insistence on judicial restraint in this area is evident in the emphasis it puts on the principle that substantial deference is owed to the legislative branch, which has the responsibility for setting criminal penalties, and the principle that the Eighth Amendment does not embody any particular theory of, or approach to, punishment. Id. at 998–99, 111 S.Ct. at 2703–04 (plurality opinion). Those principles are reinforced by Harmelin's instruction that "[t]he Eighth Amendment does not require strict proportionality between crime and sentence," and "forbids only extreme sentences that are 'grossly disproportionate' to the crime." Id. at 1001, 111 S.Ct. at 2705 (citation omitted). That is why in non-capital cases "successful challenges to the proportionality of particular

sentences are exceedingly rare," id. (quotation and other marks omitted), so rare in fact that our own Court has never found a term of imprisonment to violate the Eighth Amendment, and outside the special category of juvenile offenders the Supreme Court has found only one to do so. And that one was for a sentence of life imprisonment without parole imposed on a petty criminal who wrote a bad check for $100, the latest in a string of his relatively minor, nonviolent offenses. See Solem, 463 U.S. at 280–81, 103 S.Ct. at 3005. As the Supreme Court put it in Lockyer, "[t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case." 538 U.S. at 77, 123 S.Ct. at 1175. This is not one of those extraordinary cases, one of those exceedingly rare situations, in which the specified term of imprisonment violates the Eighth Amendment.

Farley in his briefs, and the district court in deciding the case, spent a lot of time and effort comparing the thirty-year sentence required by § 2241(c) to the punishments available or required for similar or worse crimes under the federal criminal code and in other jurisdictions. But Harmelin squarely holds that such comparisons have no place in proportionality analysis unless "a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." Harmelin, 501 U.S. at 1005, 111 S.Ct. at 2707 (plurality opinion); see also United States v. Raad, 406 F.3d 1322, 1324 n.4 (11th

107

Cir. 2005) ("Because Raad cannot make a threshold showing of disproportionality, we need not consider the sentences imposed on others."); United States v. Brant, 62 F.3d 367, 368 (11th Cir. 1995) (same).

We know from Harmelin that viewing the thirty-year sentence required by § 2241(c) in light of Farley's crime does not lead to an inference of gross disproportionality. Harmelin's sentence was life imprisonment without parole, "the second most severe penalty permitted by law." Harmelin, 501 U.S. at 1001, 111 S.Ct. at 2705 (plurality opinion). Still, the Supreme Court held that there was no inference of gross disproportionality in that case. Id. at 1005, 111 S.Ct. at 2707 ("In light of the gravity of petitioner's offense, a comparison of his crime with his sentence does not give rise to an inference of gross disproportionality. . . ."). Because Farley's crime is as bad or worse than the one Harmelin committed, and a thirty-year sentence is less severe than one of life imprisonment without parole, it necessarily follows that a sentence of thirty years is not grossly disproportionate to Farley's crime.[36] As a result, comparison of the thirty-year sentence to the sentences authorized or required under other statutes in this or another jurisdiction

---

[36] We note in passing, although it is by no means necessary to our conclusion, that a defendant who receives a thirty-year federal sentence will seldom have to serve the full thirty years in prison. Under 18 U.S.C. § 3624 federal inmates routinely receive 54 additional days' credit toward the service of their sentence at the end of each year that they have served with good behavior. Because of § 3624 an inmate could complete a 30-year sentence in 26 years and 2 months. See 18 U.S.C. § 3624; 28 C.F.R. §§ 523.20, 541.13 (2005).

is not appropriate. See id. at 1004–05, 111 S.Ct. at 2706–07 ("A better reading of our cases leads to the conclusion that intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.").

The crime in Harmelin was possession of 672 grams of cocaine. The crime here is travel across state lines with intent to sexually violate an underage child. While it is true that Farley, through no fault of his own, was unable to inflict that harm on an actual victim, the same could be said of Harmelin. After all, the 672 grams of cocaine he possessed was seized by police before any of it could be further distributed or consumed, thereby preventing harm to society. See id. at 988, 111 S.Ct. at 2698 (lead opinion). In judging the seriousness of the crime the Supreme Court in Harmelin looked at the harm caused by the type of crime involved in that case. Id. at 1002–04, 111 S.Ct. at 2705–06 (plurality opinion). We do the same here.

The Court stated in Harmelin that the "possession, use, and distribution" of illegal drugs are serious problems affecting the health and welfare of the population, and it dismissed the argument that Harmelin's crime was nonviolent and victimless as "false to the point of absurdity." Id. at 1002, 111 S.Ct. at

2705–06.  By the same token, the sexual abuse of children, and the use of the internet to facilitate that abuse, are serious problems affecting the health and welfare of the nation.  The Supreme Court, this Court, and other courts have expounded at length on the severity of crimes involving the sexual abuse of children and the extent of the harm caused by those crimes.  See, e.g., Kennedy v. Louisiana, — U.S. —, 128 S.Ct. 2641, 2646 (2008) ("Petitioner's crime [of raping his 8-year-old stepdaughter] was one that cannot be recounted in these pages in a way sufficient to capture in full the hurt and horror inflicted on his victim or to convey the revulsion society, and the jury that represents it, sought to express by sentencing petitioner to death."); id. at 2677–78 (Alito J., dissenting, joined by Roberts, C.J., and Scalia & Thomas, JJ.) ("Long-term studies show that sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." (quotation marks omitted)); New York v. Ferber, 458 U.S. 747, 758 n.9, 102 S.Ct. 3348, 3355 n.9 (1982) ("It has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults."); United States v. Pugh, 515 F.3d 1179, 1202 (11th Cir. 2008) ("[W]e have typically treated child sex offenses as serious crimes, upholding severe sentences in

110

these cases."); United States v. Searcy, 418 F.3d 1193, 1198 (11th Cir. 2005) ("[P]ersuasion, inducement, enticement or coercion of a minor to engage in unlawful sexual activity carries an inherent risk of physical injury to the minor."); United States v. Eagle, 515 F.3d 794, 799 (8th Cir. 2008) (explaining that an eight-year-old boy who had been sexually assaulted "experienced mental, emotional, and physical problems. . . . began feeling sad and unhappy and also experienced encopresis, or involuntary defecation"); see also Brief of Amici at 6–17 (discussing medical and psychiatric studies showing the long-term harm caused by the sexual abuse of children); cf. United States v. Nagel, 559 F.3d 756, 761 (7th Cir. 2009) (noting that The Protection of Children from Sexual Predators Act of 1998 "evinces a congressional recognition of the seriousness of attempted sexual enticement of a minor"). We would find any suggestion that child sexual abuse is a nonviolent crime as absurd as the Supreme Court found the same suggestion about possession of 672 grams of cocaine. See Harmelin, 501 U.S. at 1002, 111 S.Ct. at 2706 (plurality opinion). Even more so.

For these reasons, the sentence statutorily required in this case, like the one statutorily required in Harmelin, "does not surpass constitutional bounds," id. at 1008–09, 111 S.Ct. at 2709. The district court's ruling that the mandatory minimum sentence of thirty years required by § 2241(c) is constitutionally

disproportionate to the crime is due to be reversed and the lesser sentence the court imposed must be vacated.

## V.

We AFFIRM Farley's convictions on both counts, and his sentence on Count Two. We REVERSE the district court's order declaring unconstitutional the application of the mandatory minimum sentence under 18 U.S.C. § 2241(c), VACATE Farley's sentence on Count One, and REMAND with instructions to impose a sentence no less than that required by § 2241(c).